IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AAMCO TRANSMISSIONS, INC., | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | Case No. 2:11-cv-04009-BMS |
| JAMES M. DUNLAP, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

COMES NOW Defendant James M. Dunlap, by counsel, and submits this Memorandum
of Law in Opposition to Plaintiff's Motion for Preliminary Injunction.

<u>INTRODUCTION</u>

This is a dispute between a franchisor and a franchisee over the correct termination date
of a franchise. The franchisor, AAMCO Transmissions, Inc., posits that the franchise ended on
June 5, 2011. The franchisee, James Dunlap, asserts that under the terms of a 1998 renewal
agreement, the franchise was extended until June 5, 2012. The dispute is subject to a broad
arbitration provision, governing all disputes arising out of or relating to the parties franchise
agreement.

Moving aggressively, however, AAMCO has filed suit in this Court and sought a
mandatory preliminary injunction that would force Dunlap immediately to remove his AAMCO
signage, to discontinue any advertising of the AAMCO business, to turn over all AAMCO
branded materials, and to cease doing any transmission-repair work within 10 miles of his
existing center or, indeed, within 10 miles of any AAMCO center, wherever located.

This Court should deny the preliminary injunction and stay all proceedings pending arbitration.  The preliminary injunction that AAMCO seeks is a mandatory injunction that would disturb—not preserve—the status quo.  AAMCO has not met, and cannot meet, the stringent standards for such mandatory relief.  First, it is unlikely to succeed on the merits.  AAMCO's entire claim is based on the premise that the franchise expired on June 5, 2011.  But in 1998 AAMCO sent Dunlap a renewal franchise agreement that, by its plain terms, extended the franchise through June 4, 2012.  Second, AAMCO has made absolutely no showing that, by continuing to operate the same business he has operated for three decades, Dunlap will cause any irreparable harm.  Third, Dunlap's business will be devastated if he is forced to shed his AAMCO affiliation overnight.  Fourth, public policy favors withholding injunctive relief.  The preliminary injunction that AAMCO seeks would, for all intents and purposes, end this dispute.  It would put Dunlap out of business, cause the unemployment of his employees, and cause irreparable harm to Dunlap.  Yet the parties agreed to resolve their difference in an arbitral forum, not in court.  There is a strong public policy in favor of honoring arbitration agreements, which this Court should honor by denying the injunctive relief requested.

For all these reasons, elaborated further below, this Court should deny AAMCO's Motion for a Preliminary Injunction.

## FACTUAL BACKGROUND

For three decades Defendant James Dunlap has owned and operated an AAMCO franchise on South Military Highway, Chesapeake, Virginia (the "Chesapeake Center").[1] (Declaration of James Dunlap ("Dunlap Decl."), attached hereto as Exhibit 1, at ¶ 1).  Dunlap and AAMCO entered into the original franchise agreement for the Chesapeake Center on June 5,

---

[1] The Chesapeake center was originally at 1366 South Military Highway, but moved to 1330 South Military Highway in 1991.

1981 (the "1981 Franchise Agreement").  A copy of this agreement is attached as Exhibit A to the Affidavit of Brian O'Donnell.  (Docket No. 4-2, at 8).

Paragraph 16.1 of the 1981 Franchise Agreement established an initial 15-year term for the franchise, and specified certain conditions for its renewal.  Pertinent here, it contemplated that, upon renewal, a new franchise agreement would be entered into between the parties: "In connection with any renewal of the Agreement, the Franchisee agrees to execute a Franchise Agreement of the type then currently being used by AAMCO."  (Docket No. 4-2 at 13).

In 1988, Dunlap and AAMCO made certain modifications to the 1981 Franchise Agreement.  Among other things, they included a broad arbitration provision that—with exceptions not relevant here—applied to all disputes "arising out of or relating to" the 1981 Franchise Agreement.  (Docket No. 4-2, at 19).  This provision significantly expanded the types of disputes that the parties had agreed to arbitrate in the original 1981 Franchise Agreement. (Docket No. 4-2 at 14).

After the expiration of the 1981 Franchise Agreement, the parties agreed to a renewal of the contract.  (Dunlap Decl. ¶ 4-5).  On August 31, 1998, Warren Berest—AAMCO's Manager of Franchise Administration—sent Dunlap by FedEx three copies "of the renewal franchise agreement" (the "1998 Renewal Agreement").  Although the document itself is unsigned, Berest's signature appears on the cover letter.  A copy of this letter and the attached 1998 Renewal Agreement are attached to the Dunlap Declaration as Exhibit A.

An attached Amendment to the 1998 Renewal Agreement establishes the duration of the renewal.  It states that it was to extend from June 5, 1997 to June 4, 2012:

> The commencement date of the Franchise Agreement shall be June 5, 1997, and the Agreement, if not sooner terminated pursuant to provisions thereof, shall continue until June 4, 2012.

Dunlap and AAMCO have, ever since, operated under the terms of the 1998 Renewal Agreement.  (Id. at ¶ 5).

The relationship between Dunlap and AAMCO since that time has not been without its difficulties.  In 2007, AAMCO sued Dunlap in this Court seeking to terminate the franchise for the Chesapeake Center and for another facility in Portsmouth Virginia.  The parties settled that dispute.  In the Settlement Agreement, attached as Exhibit B to the O'Donnell Affidavit, the parties represented that the Franchise Agreements of both the Chesapeake Center and the Portsmouth Center would be reinstated for their existing terms.  (Docket No. 4-2, at 22).  The Settlement Agreement, however, misstates the duration of both the Chesapeake Franchise and the Portsmouth Franchise:

> As of the date of this Agreement, the AAMCO franchise agreements are reinstated for a period no longer than the remaining term of the respective AAMCO franchise agreements.  (November 29, 2008 for the Portsmouth VA AAMCO center and June 5, 2011 for the Chesapeake, VA AAMCO center).

(Docket No. 4-2, at 22).  The correct termination date for the Portsmouth VA center was September 25, 2009.  (Dunlap Decl. ¶ 6).  And, as noted above, the correct termination date for the Chesapeake Center is June 5, 2012.

On June 13, 2011, AAMCO sent Dunlap a letter stating, incorrectly, that on June 5, 2011, the franchise agreement for the Chesapeake Center "expired according to its terms."  It demands that Dunlap destroy or surrender to AAMCO all signs and other materials bearing the AAMCO mark, that he cease all advertising, and that he relinquish the Chesapeake center's telephone numbers.  It also demands that he stop performing transmission repairs—under the AAMCO logo or otherwise—within a ten-mile radius of the Chesapeake Center or of any other AAMCO shop.  (Docket No. 4-2 at 26-27).  At the same time, AAMCO pulled the Chesapeake Center

from its internet listings, causing a substantial diminution of the Chesapeake Center's business. (Dunlap Decl. ¶ 7)

The Chesapeake Center currently has 7 employees.  (Id. at. ¶ 8).  In its 30 years of operation, it has been a productive franchise.  Indeed, recently it has been in the top 50 performing centers nationwide for 18 of the last 23 weeks.  (Id.).   Only seven centers nationwide can claim this accomplishment.  Through its quality service, over an almost thirty year period, it has established substantial goodwill for the AAMCO name in the Chesapeake community.  (Id. at. ¶ 9).  It continues to operate in accordance with the 1998 Renewal Agreement. (Id. at ¶ 10).  It uses standard AAMCO signage and procedures.  (Id.).  It continues to report its income to AAMCO.  (Id.).  And it continues to pay franchise fees to AAMCO.  (Id.).

The relief sought by AAMCO in its Motion for Preliminary Injunction would have an immediate and fatal effect on Dunlap's business.  (Id. at ¶ 11).  Taking down the AAMCO signs, pulling advertisements, transferring existing phone numbers to AAMCO, and moving his business 10 miles from the Chesapeake center or any other AAMCO center located in the Tidewater Virginia market, would mean that loyal customers no longer would be able to locate him.  (Id.).  It would cause the loss of a 30 year investment—an investment of time, money, and goodwill.  (Id.) .  It would lead to the unemployment of his employees.  (Id.).  And it may lead to Dunlap's bankruptcy.  (Id.).

## ARGUMENT

### I.     Preliminary injunctive relief is an extraordinary remedy that should be granted sparingly.

#### A.     Preliminary injunctions preserve the status quo pending the outcome of the parties' dispute.

The Third Circuit has repeatedly admonished that "[p]reliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Kos*

*Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994)).  Motions for preliminary injunctions require courts to make quick decisions based on incomplete information—information that is presented without the benefit of discovery or the safeguards of the rules of evidence.  *Hodinka v. Delaware County*, 759 F. Supp. 2d 603, 613 (E.D. Pa. 2011) (noting that preliminary injunction rulings are "provisional decisions" that are usually based "on incomplete evidence and a relatively hurried consideration of the issues") (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2950 (2d ed. 1995)).

For that reason, preliminary injunctions are principally geared towards preserving the status quo, which the cases define as the "last, peaceable, noncontested status of the parties." *Noasha LLC v. Nordic Group of Companies, Ltd.*, 630 F. Supp. 2d 544, 549 (E.D. Pa. 2009) (quoting *Kos Pharmaceuticals*, 369 F.3d at 708).  Where, as here, a party seeks a *mandatory* injunction to alter the status quo, courts hesitate to grant preliminary injunctive relief.  In such a circumstance, the party seeking the injunction must make an exceptionally strong showing of its entitlement to preliminary relief.  *MarbleLife, Inc. v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 557 (E.D. Pa. 2010) ("When a movant seeks a preliminary injunction that is directed at not merely preserving the status quo but at providing mandatory relief, the burden on the moving party is 'particularly heavy.'") (quoting *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir.1980)).  *See also* 42 Am. Jur. 2d Injunctions § 10 ("Where a preliminary mandatory injunction is granted, greater scrutiny is applied to the grant than to a prohibitory injunction because it is an extraordinary remedy that should be utilized only in the rarest of cases.").

### B.     Preliminary Injunction Standard

The requirements for a preliminary injunction are well-settled.   Under the Supreme

Court's most recent formulation of the standard:

> A plaintiff seeking a preliminary injunction must establish that he
> is likely to succeed on the merits, that he is likely to suffer
> irreparable harm in the absence of preliminary relief, that the
> balance of equities tips in his favor, and that an injunction is in the
> public interest.

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249

(2008).

### II.     AAMCO cannot establish any—let alone all—of the *Winter* elements for preliminary-injunctive relief.

#### A.     The mandatory injunctive relief that AAMCO seeks would disturb the status quo.

Preliminary injunctive relief is not appropriate in this case because it would change, not

preserve, the status quo.   The "last, peaceable, noncontested status of the parties" was Dunlap's

operation of the Chesapeake center as an AAMCO franchise.   The injunction that AAMCO seeks

would alter this state of affairs.   AAMCO asks this Court to issue a mandatory injunction to force

Dunlap to take down his AAMCO signs, to change his phone numbers, and to move his business

to more than 10 miles away from the Chesapeake Center—or any other AAMCO franchise.

As a party seeking mandatory injunctive relief that will disturb the status quo, AAMCO

bears an especially heavy burden of showing that all four requirements for a preliminary

injunction have been met.   AAMCO has not met that burden.   Indeed, it satisfies none of the four

preliminary injunction requirements.

#### B.     AAMCO is unlikely to succeed on the merits.

As an initial matter, AAMCO has not established, and cannot establish, that it is likely to

succeed on the merits because—contrary to the allegations in the Complaint—the Franchise

Agreement has not expired.  The Complaint in this case is of the shotgun variety.  AAMCO has

sued for trademark infringement (Count I), specific performance of franchise agreement (Count

II), common law unfair competition (Count III), breach of contract (Count IV), attorney's fees

(Count V), and declaratory judgment (Count VI).  But with the exception of a small claim for an

unpaid balance of certain franchise fees—an claim compensable with money damages and not a

proper basis for preliminary injunctive relief—all of AAMCO's claims are based on the premise

that the Franchise Agreement expired on June 5, 2011.

     That premise is false.  As set forth above, on August 31, 1998, AAMCO sent a letter—

signed by Warrant Berest, Manager of Franchise Administration—enclosing Dunlap's "renewal

franchise agreement."  (Dunlap Decl. at Exh. A)  The renewed Franchise Agreement, which has

an effective date of September 2, 1998, has governed the rights of the parties ever since.[2]  (Id. at

¶ 5)   Relevant here, an attached amendment to paragraph 16.1 stated that the term of the

franchise extended until June 4, 2012:

> The commencement date of the Franchise Agreement shall be June
> 5, 1997, and the Agreement, if not sooner terminated pursuant to
> provisions thereof, **shall continue until June 4, 2012**.

(Id. at Exh. A) (emphasis added).  Up to the present, Dunlap has operated under the terms of that

renewed Franchise Agreement.

     AAMCO tellingly omits any reference to the 1998 renewal in its Complaint and in its

Preliminary Injunction papers.  Instead, it cites a Settlement Agreement executed nearly a decade

later, in connection with unrelated litigation between the parties.  The July 11, 2007, Settlement

---

[2] Although AAMCO claims it cannot locate an executed copy of this Franchise Agreement, the fact that AAMCO
signed the letter enclosing it is sufficient to overcome whatever statute-of-frauds issues the lack of a signature might
present.

Agreement, by its plain terms, reinstated Dunlap's Portsmouth, Virginia, and Chesapeake, Virginia, AAMCO franchises to the terms that were in place before that litigation:

> As of the date of this Agreement, the AAMCO franchise agreements are reinstated for a period no longer than **the remaining term of the respective AAMCO franchise agreements**.

(Docket No. 4-2 at 22) (emphasis added).  But the instrument then misstates the actual remaining terms of those franchises.  For the Portsmouth franchise, it incorrectly identifies November 29, 2008, as the termination date.  (Dunlap Decl. at ¶ 6)   (The correct termination date was September 25, 2009). (Id.).   Relevant here, it incorrectly identifies June 5, 2011 as the termination date for the Chesapeake franchise. (Id.)   (The correct termination date is June 5, 2012).   Thus, AAMCO's entire breathless, multi-count, preliminary-injunction motion is founded on an erroneous recital in a Settlement Agreement regarding unrelated claims.  Preliminary injunction motions should be made of sterner stuff.

AAMCO, no doubt, will claim that the recital in the 2007 Settlement Agreement should control the issue and dictate the termination date.  This argument will fail.  The text of the agreement makes it clear that the parties merely intended to reinstate their contractual relationship "for their remaining term of the respective AAMCO franchise agreement."  There is no indication that they intended to shorten it or otherwise alter it.  So the termination dates included parenthetically in the Settlement Agreement have no independent legal effect.  They are just incorrect recitals of extrinsic facts.  It is the actual termination dates in the actual operative Franchise Agreements—not the dates referenced in the Settlement Agreement—that control the

present case.   And as explained above, the actual termination date in the renewal Franchise Agreement is June 5, 2012.[3]

That Dunlap's Chesapeake AAMCO franchise will not expire until June 5, 2012, is fatal to all of the claims that could ground AAMCO's present request for preliminary injunctive relief. AAMCO's Lanham Act claim is premised on the allegation that Dunlap is using AAMCO's trademark without authorization.  (Compl. ¶ 28).   Yet unless and until the Franchise Agreement is validly terminated, Dunlap is an AAMCO franchisee and has the right to hold himself out as such.  *See Dunkin' Donuts Franchised Restaurants LLC v. Mehta*, 2007 WL 2688710 (W.D. Pa. 2007) (finding that plaintiff franchisor was unlikely to succeed on the merits of its trademark claim against franchisee because "Defendant, who is arguably Plaintiff's franchisee, is not acting as a competitor, but continues to operate under the terms of the franchise agreement."). Likewise, the claim that Dunlap has violated Section 19.1 of the Franchise Agreement—which prescribes actions that a franchisee must take upon termination of the franchise—is a nonstarter, as the Franchise Agreement has not yet expired.  (Compl. ¶¶ 39-40).   Finally, AAMCO's claim for common-law unfair competition fails because it is not unfair competition for Dunlap to truthfully represent the Chesapeake shop as an AAMCO franchise.  (Compl. ¶ 44).

Because the renewal Franchise Agreement does not expire until June 5, 2012, AAMCO is unlikely to succeed on the merits of its claims.  For this reason alone, this Court should deny AAMCO's motion.

---

[3] Indeed, in litigation filed against Dunlap in 2010 in this Court relating to the termination of Dunlap's Portsmouth franchise, AAMCO alleged that the franchise agreement had originally ended on September 25, 2009.  (See Declaration of Brian O'Donnell attached to Motion for Preliminary Injunction filed by AAMCO in Case No. 10-611 in this Court styled, AAMCO Transmissions, Inc. v. Dunlap.  That Affidavit is attached hereto as Exhibit 2.

#### C.    AAMCO will not suffer any harm by allowing Dunlap to continue to operate his thriving AAMCO franchise.

AAMCO also cannot establish that it will suffer irreparable harm if an injunction does not issue.  To succeed in this showing, a party must demonstrate a real likelihood of imminent injury—not a remote possibility of harm at some indefinite time in the future.  *Campbell Soup Co. v. Conagra*, 977 F.2d 86, 91 (3d Cir.1992) ("[A] showing of irreparable harm is insufficient if the harm will occur only in the indefinite future.  Rather, the moving party must make a clear showing of immediate irreparable harm.").  *See also Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) ("[W]e have . . . insisted that the risk of irreparable harm must not be speculative."); *MarbleLife, Inc. v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 562 (E.D. Pa. 2010) ("[T]he injury must be a presently existing threat, and not a remote or speculative possibility of future harm.").

AAMCO has presented no evidence of any irreparable harm that it will suffer if an injunction does not issue.  It does not claim, for example, that the continued operation of the Chesapeake, Virginia, AAMCO site will damage AAMCO's "fine public reputation" for quality transmission repair.  (Compl. ¶ 7).  Nor is there any claim that Dunlap has otherwise harmed the distinctive AAMCO trademark, e.g., by deviating from the "standards and policies governing the quality of service to be provided to the public."  (Compl. ¶ 9).  There is, in short, not a scintilla of evidence that, by continuing to operate this 30-year-old AAMCO franchise during the pendency of this litigation, Dunlap will do anything to damage AAMCO's reputation.  *See Grosso Enters., inc. v. Domino's Pizza LLC*, 2011 WL 816620, Case No. 11-1484, at *6  (E.D. Pa. Mar. 9, 2011) ("[T]he harm to defendant if Grosso Enterprises continues to operate as a Domino's franchise until such time as the Court rules on the merits of plaintiff's claim is de minimis.").  The reality

is that the Chesapeake AAMCO has been a consistently high-performing facility whose continued operation will burnish, not tarnish, AAMCO's reputation. (Dunlap Decl. at ¶ 8)

Rather than present any evidence, AAMCO simply argues that this Court should *presume* irreparable harm because "Defendant is misleading customers into believing that Defendant's competing business is a bona fide AAMCO Transmission Center when it is not." (Br. at 13). This Court should recognize this bootstrapping argument for what it is. It presupposes that the term of the Franchise Agreement has expired. But, as explained above, the Franchise Agreement does not expire until June 5, 2012.

More to the point, this case is not about misappropriation of reputation. Unlike the trademark cases that AAMCO relies on, this is not an instance of an interloper calling itself "AAMCO" when it has no colorable right to do so. This is simply a contract dispute over the correct duration of a franchise.

For this reason, the present case is distinguishable from *S&R v. Jiffy Lube International, Inc.*, 968 F.2d 371 (3d Cir. 1992), the principal case on which AAMCO relies. There— unlike here—the franchisor, Jiffy Lube, had validly terminated its franchise and the franchisee had long ceased paying royalties. Nevertheless, the franchisee continued to operate the  facility as a "Jiffy Lube." It used nonconforming signage, and adopted practices and procedures that deviated from franchise requirements.  The franchisee maintained that the franchisor's pre-termination misconduct somehow justified its continued use of the franchise mark even after a valid termination of the franchise.  Not surprisingly, the Third Circuit disagreed, and found that the franchise's continued use of the "Jiffy Lube" mark would cause the franchisor irreparable harm.

In the present case, unlike *S&R*, Dunlap is operating under a valid franchise agreement that has not been properly terminated.  He is complying with franchise requirements and making

the required royalty payments.[4]   And he is not using any nonconforming signage or adopting unorthodox policies or procedures.   He is simply running the facility in the same way he has done for the last 30 years.   There is, in short, no factual basis to find irreparable harm to AAMCO, and no legal basis to presume it.   Because AAMCO has not shown—and cannot show—irreparable harm, this Court should deny preliminary injunctive relief.

> **D.   The injunctive relief requested would be a death sentence for a business that has been in place for three decades.**

In contrast to the non-existent harm that maintaining the status quo would entail, granting AAMCO's requested injunctive relief would have immediate and severe consequences for Dunlap's Chesapeake business.   Courts—including this Court—recognize that forcing a long-established business to shed its franchise affiliation overnight is a drastic remedy that can cause severe and irreparable harm to the franchisee.   *See Grosso Enters., inc. v. Domino's Pizza LLC*, 2011 WL 816620, Case No. 11-1484, at *6  (E.D. Pa. Mar. 9, 2011)  ("The loss of a fourteen-year franchise . . . cannot be measured solely in monetary terms.   By contrast, the harm to defendant if Grosso Enterprises continues to operate as a Domino's franchise until such time as the Court rules on the merits of plaintiff's claim is de minimis."); *Dunkin' Donuts Franchised Restaurants LLC v. Mehta*, 2007 WL 2688710 (W.D. Pa. 2007) (finding that the termination of a Baskin Robbins/Dunkin' Donuts franchise during the pendency of litigation would cause irreparable harm to the franchisee); *LaGuardia Assocs. v. Holiday Hospitality Franchising, Inc.*, 92 F. Supp. 2d 119, 131 (E.D.N.Y. 2000) (holding that loss of Holiday Inn franchises would cause franchisees irreparable harm); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling*

---

[4] To be sure, AAMCO claims that Dunlap has an unpaid balance of $17,267.74 for miscellaneous items.  (Compl. ¶ 54).  But unlike *S&R v. Jiffy Lube* there is no allegation of years of unpaid royalties.  The dispute over franchise fees is a routine disagreement between franchisor and franchisee, which is neither a material breach of the franchise agreement nor a basis for extraordinary relief like a preliminary injunction.

*Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (holding that equities weighed "rather heavily" against terminating a distributorship pending litigation of the parties' dispute).

Judge Weinstein's decision in *LaGuardia Assocs. v. Holiday Hospitality Franchising, Inc.*, *supra* is instructive.  The franchisor in that case was Holiday Hospitality Franchising, Inc., owner of the Holiday Inn  brand of hotels.  It sought to immediately terminate the franchise agreements of two of its large franchisees near the JFK and LaGuardia airports in New York.  The franchisees argued that doing so would cause them irreparable harm.  The court agreed.  After first describing the interdependent relationship of franchisors and franchisees, the court noted the irreparable harm that immediate termination of a franchise generally causes to the franchisee:

> The franchise relationship is the lifeline of the franchisee's business; the franchisee's investment of capital, time, and effort in promoting the franchisor's goods or services—to the general exclusion of competing goods and services—would be irreparably lost upon termination.  Money damages cannot make the franchisee in such situations whole.

92 F. Supp.2d at 131 (citing *Roso-Lino Beverage Distribs., Inc., supra.*, 749 F.2d at 125-26) .  Accordingly, it found that the franchisees would suffer irreparable harm by being forced to shed, overnight, their affiliation with the Holiday Inn network of hotels.  *LaGuardia Assocs.*, 92 F. Supp.2d at 131.

In the present case, too, granting the preliminary injunctive relief that AAMCO requests would have disastrous effects on Dunlap's Chesapeake business.  (Dunlap Decl. at ¶ 11)

**E.      Public policy favors withholding injunctive relief so that the parties' contract dispute can be resolved in arbitration.**

Finally, public policy weighs against the preliminary injunctive relief that AAMCO seeks.  As noted above, the parties have agreed to submit their disputes to arbitration.[5]  There is a strong public policy in favor of arbitration—a policy embodied in the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.  Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir.2003) ("It is well established that the Federal Arbitration Act (FAA), reflects a 'strong federal policy in favor of the resolution of disputes through arbitration.'") (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009)).

Under either side's view of this case, there is a binding arbitration agreement.  AAMCO claims that the 1981 Franchise Agreement—as amended in 1988—governs the parties' relationship.  But as noted above, the 1988 Amendment includes a broad arbitration clause that covers all disputes "arising out of or relating to" the franchise agreement.  Dunlap contends that the matter is governed by the 1998 Renewal Agreement.  But this, too, contains a broad arbitration provision governing disputes "arising out of or relating to this Agreement."  So regardless of whether the parties are governed by (1) 1981 Franchise Agreement, as amended in 1988, or (2) the 1998 Renewal Agreement, the parties must arbitrate the current dispute.[6]

---

[5] Contemporaneous with the present opposition brief, Dunlap is filing a motion to stay litigation pending arbitration of the parties' dispute.

[6] Dunlap anticipates that AAMCO will argue that he has waived arbitration by filing a counterclaim in certain earlier litigation between the parties.  This argument will fail, as any such waiver would have applied only to that dispute— not to the current dispute over the proper termination date of the franchise.  *See, e.g.*, *Grumhaus v. Comerica Securities, Inc.*, 223 F.3d 648, 652 (7th Cir.2000) ("We agree that different claims may arise from a common factual basis, and that in one claim, a party may wish to waive arbitration while preserving that right in the other."); *Doctor's Associates, Inc. v. Distajo*, 107 F.3d 126, 133 (2d Cir.1997) ("only prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate").

An injunction shutting down Dunlap's franchise would, however, put the Chesapeake enterprise out of business and as a practical matter end this dispute. This would make any subsequent arbitration virtually meaningless. And it would have the net effect of imposing a judicial solution to a dispute that can, and should, be arbitrated. That would violate the "strong federal policy in favor of the resolution of disputes through arbitration."

It is true that district courts have jurisdiction to enter a preliminary injunction in an arbitrable dispute where doing so is necessary to preserve the status quo and make any subsequent arbitration meaningful. *Ortho Pharmaceutical Corp.*, 882F.2d 806, 814 (3d Cir. 1989). But the mandatory injunction that AAMCO seeks would have precisely the *opposite* effect. It would irrevocably alter the status quo and render any later arbitration regarding the franchise's termination date utterly meaningless. The case would be over before it began. Where, as here, the parties have selected an arbitral forum to resolve their disputes, it violates public policy for a court to enter an injunction that would have the practical effect of denying a defendant's right to arbitrate its dispute. Accordingly, public policy favors denying the requested preliminary injunction relief and staying this case pending arbitration.

## CONCLUSION

The mandatory injunction that AAMCO seeks would upset the status quo, would put Dunlap out of business, and would effectively shut him out of arbitration. Because AAMCO has not come close to showing that any of the preliminary injunction weighs in its favor—let alone all of them—this Court should deny AAMCO's motion, stay this case, and compel arbitration of the parties' disputes.

JAMES M. DUNLAP

By counsel

16

/s/ Thomas C. Regan
(electronically signed)

_____

Thomas C. Regan, Esq.
**LeClair Ryan**
Two Penn Plaza East
Newark, NJ 07105
Telephone No. (973) 491-3600
Thomas.Regan@leclairryan.com
*Counsel for Defendant*


W. Michael Holm (Va. Bar # 21035)
**LeClair Ryan**
2318 Mill Road, Suite 1100
Alexandria, VA  22314
Telephone No. (703) 647-5927
Michael.Holm@leclairryan.com
*Of counsel*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading was served electronically via the court's

ECFsystem on:

William B. Jameson
AAMCO Transmissions, Inc.
201 Gibraltar Road, Suite 150
Horsham, PA 19044


/s/ Thomas C. Regan
(electronically signed)

_____

Thomas C. Regan, Esq.
**LeClair Ryan**
Two Penn Plaza East
Newark, NJ 07105
Telephone No. (973) 491-3600
Thomas.Regan@leclairryan.com
*Counsel for Defendant*