## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA
## CIVIL ACTION - LAW

| | |
|---|---|
| AAMCO TRANSMISSIONS, INC. | : |
| Plaintiff, | : |
| v. | : |
| JAMES M. DUNLAP | :    No.  2:11-cv-04009-BMS |
| Defendants. | : |

## DECLARATION OF WILLIAM B. JAMESON

I, William B. Jameson, an adult individual, being duly sworn, declare as follows:

1.    I am Associate General Counsel for AAMCO Transmissions, Inc. ("ATI").

2.    I was one of the counsel for Plaintiff ATI in the 2007 litigation with Dunlap captioned, *AAMCO Transmissions, Inc. v. Dunlap*, U.S.D.C. (E.D.Pa.), civil action no. 07-00562 (TJS) (hereinafter, the "Prior Action").

3.    In the Prior Action, ATI brought claims against Dunlap substantially similar to those set forth in the instant action – i.e., trademark infringement, unfair competition, and breach of the Franchise Agreement.

4.    In the Prior Action, ATI had terminated the Franchise Agreement based upon Dunlap's failure to pay sums due and owing.

5.    In the Prior Action, like in the instant action, Dunlap refused to recognize the termination of his Chesapeake Franchise and continued to operate under the AAMCO trademark.

6.    In the Prior Action, like the instant action, ATI was forced to file a Motion for Preliminary Injunction seeking to have Dunlap enjoined from continuing to operate a competing transmission repair business using ATI's marks at the Chesapeake location.

7.    The Prior Action however was resolved when, Dunlap, after stating in a sworn affidavit filed with the Court that the 1981 Franchise Agreement did, in fact, "renew" for an

additional term "expiring in 2011," executed a settlement agreement premised on a June 2011

expiration for the Chesapeake Franchise (the "Settlement Agreement").

8.       Specifically, on July 17, 2007, the parties executed the Settlement Agreement

wherein Dunlap agreed that:

> As of the date of this Agreement, the AAMCO franchise agreements are
> reinstated for a period not longer than the remaining term of the respective
> AAMCO franchise agreements (November 29, 2008 for the Portsmouth, VA
> AAMCO center and June 5, 2011 for the Chesapeake, VA AAMCO center) for
> the limited purpose of permitting Mr. Dunlap to operate the centers so that they
> can be sold as AAMCO centers to third party purchasers.

A true and correct copy of the Settlement Agreement is attached to ATI's Motion for

Preliminary Injunction in the instant action. *See* ECF Doc. 4-2.

9.       The Settlement Agreement in the Prior Action was intensely negotiated between

the parties' respective counsel before being fully executed by the parties and becoming a legally

binding document that formed the basis of the Court's order of dismissal.

10.      In the prior Action, Dunlap filed a sworn affidavit, a true and correct copy which

is attached hereto at Exhibit "A" (the "Dunlap Affidavit").

11.      The Dunlap Affidavit reads in pertinent part as follows:

> I, James M. Dunlap, being duly sworn according to law hereby
> depose and state:
>
> 1.       The factual statements contained herein are based on my
> personal knowledge and I am fully competent to testify in Court to
> these facts.
> ....
> 6.       By a franchise agreement dated June 5, 1981, I opened a
> second AAMCO franchise located at 1366 South Military
> Highway, Chesapeake, Virginia 23320 (the "Chesapeake Center").
> ....
> 34.      ...AAMCO allowed the franchise agreement to renew per
> its terms for an additional 15 year period, expiring in 2011.

12.     In a letter dated July 6, 2011, ATI, through its General Counsel, expressly put Dunlap on notice of his inconsistent positions with respect to the expiration date of his Chesapeake Franchise.  A copy of the said letter is attached at Exhibit "B".

13.     On July 11, 2007, Dunlap executed the Settlement Agreement and agreed to sell his Chesapeake Center and get out of the ATI franchise system on or before June 5, 2011. *See* ECF Doc. 4-2.

14.     Before the Prior Action resolved, the parties engaged in motion practice and substantial discovery on their respective positions.

15.     I declare under penalty of perjury that the foregoing statements are true and correct.

William B. Jameson

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

AAMCO TRANSMISSIONS, INC.,

                              **Plaintiff,**

    v.

JAMES M. DUNLAP,

                            **Defendant.**

**Civil Action No. 07-00562 (TJS)**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## AFFIDAVIT OF JAMES M. DUNLAP

STATE OF VIRGINIA              :
                              : SS

CITY OF PORTSMOUTH      :

    I, James M. Dunlap, being duly sworn according to law hereby depose and state:

    1.      The factual statements contained herein are based solely on my personal knowledge and I am fully competent to testify in Court to these facts.

    2.      I am the current owner and operator of two AAMCO franchises in the State of Virginia.

    3.      By a franchise agreement dated September 26, 1978, I became an AAMCO franchisee in the designated area of Norfolk/Virginia Beach/Portsmouth, Virginia/North Carolina Standard Metropolitan Statistical Area (the "Portsmouth Center").

    4.      The Portsmouth Center is located at 4117 Portsmouth Boulevard, Portsmouth, Virginia 23701, and has been at this same location since 1978.

    5.      At the time I opened the Portsmouth Center, I had the only AAMCO center in Portsmouth.

6.      By a franchise agreement dated June 5, 1981. I opened a second AAMCO franchise located at 1366 South Military Highway, Chesapeake, Virginia 23320 (the "Chesapeake Center").

7.      The Chesapeake Center has been located in the 1300 block of South Military Highway since 1981, having moved only once in 1991 from 1366 to 1330.

8.      At the time I opened the Chesapeake Center, I had the only AAMCO center in Chesapeake.

9.      Currently, the Portsmouth Center employs 6 people, consisting of a manager and 5 mechanics.

10.     Similarly, the Chesapeake Center employs 5 people, consisting of a manager and 4 mechanics.

11.     The Portsmouth Center and the Chesapeake Center (jointly referred to as the "Centers") are my sole source of income and livelihood.

12.     If AAMCO is allowed to terminate the Centers, all the employees at the Centers and myself will be unemployed.

13.     The original franchise agreement for the Portsmouth Center was for a 15 year term, and would automatically renew for additional 5 year terms unless either party gave written notice of their intent to terminate the agreement 4 months prior to the expiration date of September 26, 1993.

14.     Neither I nor AAMCO provided a notice of intent to terminate the franchise agreement.

15.     To the contrary, in April 1993, I received a letter dated April 1, 1993 from Max Cades, Manager Franchise Administration, stating that "[o]n September 25, 1993,

you will be an AAMCO franchisee for fifteen years, a soon-to-be 'second generation' AAMCO member of the family. We look forward to another period of success and mutually profitable years."

16.     Shortly after receipt of the April 1, 1993, AAMCO brought me to Bala Cynwyd, Pennsylvania to sign a new franchise agreement that I was lead to believe would be for an additional 15 year term.

17.     When I arrived at the meeting, which was attended by Max Cades and Michael Pekula from AAMCO, and tape-recorded by AAMCO, I was told by AAMCO that I was being offered a one year probationary franchise agreement allegedly because of a problem at the Chesapeake Center that had nothing to do with the Portsmouth Center.

18.     Mr. Pekula acknowledged that no problems currently existed at either Center.

19.     I stipulated that any prior problems had been resolved at the Chesapeake Center.

20.     Notably, the unrelated problems at the Chesapeake Center were caused solely be a manager brought to me by AAMCO and that AAMCO insisted that I hire to manage the Chesapeake Center.

21.     The manager was subsequently terminated by me and no further problems ensued at the Chesapeake Center.

22.     Nevertheless, AAMCO adamantly insisted that I either sign the one year probationary agreement or be terminated as franchisee at the Portsmouth Center as of September 26, 1993.

23.     After having been brought to the meeting in Pennsylvania under false pretenses and having been threatened to have my entire livelihood taken away, I felt forced to sign the one year probationary franchise agreement for the Portsmouth Center.

24.     On March 18, 1996, I returned to Bala Cynwyd to renew my Chesapeake franchise, which was scheduled to expire on June 4, 1996

25.     This meeting was attended by Gary Zimmerman, Mario Leher and Gerald Ferrier.

26.     Mr. Zimmerman stated that I owed $10,000 to AAMCO, which I disputed.

27.     After several minutes of argument, it was agreed that I would write a check for all fees that were properly owed to AAMCO.

28.     Mr. Zimmerman then left the meeting and Mr. Ferrier and I adjourned to his office to review the numbers.

29.     In a short time, we had eliminated several discrepancies, and the actual fees owed were approximately $3,000.

30.     I told Mr. Ferrier that I would write him a check as soon as I returned to Virginia.

31.     Upon my return to Virginia, I sent a check via Federal Express in the actual amount agreed due by Mr. Ferrier.

32.     Despite having sent the entire amount owed according to AAMCO, on March 27, 1996, Mr. Zimmerman sent me a letter in which he accused me of having "reneged" on the agreement and notifying me that the Chesapeake Center's franchise agreement would not be renewed.

33.     After following-up with AAMCO, it was discovered by Mr. Ferrier at AAMCO that the check had been sitting in the "mailroom" for over a week and AAMCO failed to post it to my account.

34.     Upon this discovery, AAMCO allowed the franchise agreement to renew per its terms for an additional 15 year period, expiring in 2011.

35.     Throughout my history with AAMCO, I have been wrongfully accused of not submitting reports and not paying costs or expenses that were purportedly due to AAMCO.

36.     In August of 1996, I was contacted by Mr. Ferrier and told that I had to come to Bala Cynwyd for a meeting with Bill Schnitzer, the president of AAMCO.

37.     I was told that if I did not attend that meeting scheduled on a Tuesday, Mr. Schnitzer would personally be down on Monday to remove my AAMCO signs.

38.     I called Mr. Schnitzer to request an agenda for the meeting and he replied "Don't worry about an agenda, you just be here."

39.     I attended the meeting which was presided over by Brian O'Donnell.

40.     In attendance were Mr. Schnitzer, Warren Berrest and Karen von Dreusche.

41.     I was immediately asked whether I had a Snap On Scanner at each of my Centers.

42.     I replied "no" and explained that I had one Snap On Scanner that was shared by both Centers when necessary.

43.     In response, I was told that I owed $400 in inter-shop fees to AAMCO.

44.    I responded to Mr. Schnitzer that I did not owe the $400 as it had been previously paid and AAMCO had failed to post the payment.

45.    Mr. Schnitzer then left the room, and upon his return admitted that the $400 had been paid; however, he stated that he had decided to take my sign down anyway.

46.    Mr. Schnitzer then left the room, and Mr. O'Donnell said that he would give me 30 days to sell the Portsmouth Center.

47.    Mr. Schnitzer then returned to the room and said that he would agree to Mr. O'Donnell's offer to allow me to sell the Portsmouth Center.

48.    I did not agree to the offer, and AAMCO finally backed-down.

49.    I later learned that the purpose of the meeting had nothing to do with my performance or the lack of a Snap On Scanner, but rather was based on AAMCO's need to assist another dealer in the purchase of an AAMCO dealership.

50.    In the overwhelming majority of incidents, I have proven that AAMCO's records were incorrect and that amounts allegedly owed in fact had been paid and reports supposedly not submitted had in fact been sent.

51.    In the instances in which I concurred with AAMCO's claims that amounts or reports were outstanding, I immediately remedied those situations in accordance with the terms of my franchise agreements.

52.    Since early 2000, I have disputed amounts allegedly owed to a third party insurer named AON Warranty Group ("AON").

53.    I also have sought the reimbursement of sums owed to the Centers for claims submitted to AON that were never reimbursed.

54.   By letter dated November 15, 2004, I wrote to Karen A. von Dreusche, former Associate general Counsel for AAMCO, and notified her of the claims submitted for reimbursement that were never paid and specifically disputing that any amounts were owed by me to AON.

55.   Ms. Von Dreusche never responded to my letter and no further action was taken by AAMCO to collect the alleged AON monies even though I offered to have the dispute arbitrated as provided for in the franchise agreements.

56.   Despite the fact that this dispute is more than 4 year old and with a third party, AAMCO now insists that it is entitled to collect amounts allegedly owed to others without presenting any evidence of such a right.

57.   Any claim by AAMCO for past due amounts I allegedly owe to AON is a pretext for its wrongful actions in purportedly terminating the franchise agreements with me for the Centers.

58.   In late 2005 and early 2006, AAMCO again began to wrongfully accuse me of failing to submit weekly reports.

59.   On two separate occasions I submitted all of the reports requested by AAMCO but still was not given credit for the submissions.

60.   The first submission was sent by Federal Express.

61.   The second submission was by fax.

62.   On April 1, 2006, I wrote to Gerald Ferrier, Director of Financial Services at AAMCO, notifying him that any and all allegedly past due reports had been submitted twice, and that I had addressed this issue with Barbara, to whom Mr. Ferrier had referred me, who acknowledged that the reports had been received but not posted to my account.

63.    Mr. Ferrier never acknowledged receipt of the April 1, 2006 letter.

64.    On April 18, 2006, I wrote again to Mr. Ferrier regarding payments that I had made in October 2005 that still had not been posted to my account by AAMCO.

65.    In response to my letters and efforts to have AAMCO acknowledge receipt of monies and reports purportedly due, on May 8, 2006 AAMCO mailed a letter to the Portsmouth Center and a letter to the Chesapeake Center entitled "Notice of Material Default and Intent to Terminate" (the "Termination Letters").

66.    I received the Termination Letters on May 9, 2006.

67.    The Termination Letters improperly asserted that the Centers had outstanding over a years worth of weekly business reports along with repair orders.

68.    The Termination Letters also incorrectly asserted that there were fees in the amount of $43,605.86 owed by the Chesapeake Center and $34,593.02 owed by the Portsmouth Center.

69.    The number of outstanding reports and amounts purportedly owed by the Centers were grossly exaggerated by AAMCO.

70.    On May 18, 2006, I sent two checks to AAMCO as full payment of the actual amounts owed to AAMCO.

71.    The first check was in the amount of $1,627.01 representing the entire amount owed for parts, inter-shop fees, national creative advertising fees, and FOCUS software fee.

72.    The second check was in the amount of $14,125.41 representing the entire amount owed for allegedly past due franchise fees and miscellaneous expenses to AAMCO.

73.     Both checks were received and cashed by AAMCO.

74.     Remarkably, an AAMCO Franchise Fee Account Sheet dated May 26, 2006 shows a credit balance of $21,619.07 in my account with AAMCO as of that date.

75.     Also within the thirty day period after receipt of the Termination Letters, I submitted all of the available weekly reports and repair orders that were identified in the Termination Letters.

76.     Thus, I cured all of the deficiencies identified in the Termination Letters within the time periods provided for in the respective franchise agreements.

77.     Despite my compliance with the requirements of the franchise agreements, AAMCO on June 9, 2006 sent two letters each entitled "Termination of Franchise."

78.     One letter was sent to the Portsmouth Center and the other was sent to the Chesapeake Center.

79.     Thus, on June 9, 2006, AAMCO wrongfully and in breach of the franchise agreements purportedly terminated its relationship with the Portsmouth Center and the Chesapeake Center.

80.     Despite the purported termination of the franchise agreements, AAMCO continued to treat the Centers as fully authorized AAMCO franchises.

81.     Through October 2006, AAMCO continued to invoice the Centers for franchise fees and I continued to pay those invoiced fees.

82.     Also AAMCO continued to notify the Centers if there were any missing weekly reports.

83.     By letters dated October 6, 2006, AAMCO notified the Centers about allegedly missing reports.

84.     Both letters state "[a]s part of your license agreement you are required to submit your weekly business report by Tuesday of each week."

85.     The October 6th letter to the Portsmouth Center identified only 3 allegedly missing reports dated 4/9/05, 6/24/06 and 9/30/06 -- one report dated more than a year before the alleged termination on June 9, 2006.

86.     The October 6th letter to the Chesapeake Center similarly identified only 3 allegedly missing reports dated 5/13/06, 8/12/06 and 9/30/06 – one report dated before the alleged termination on June 9, 2006.

87.     By letter dated October 12, 2006, I responded to the Portsmouth Center letter by sending the two reports for 2006, one of which I had previously submitted, and again explained that the 4/9/05 report was not available because of a system crash that occurred back in 2005.

88.     By letter dated October 19, 2006, I responded to the Chesapeake letter and enclosed the three requested reports, two of which my records show were previously submitted (the 6/13/06 and 8/12/06 reports).

89.     Thus in October 2006, AAMCO's own records unequivocally establish that less than a handful of reports were purportedly outstanding for the Centers.

90.     Despite continuing to treat the Centers as authorized franchises through October 2006 and my repeated objections to the alleged terminations, by letter dated July 18, 2006, AAMCO's then General Counsel, Mary C. McMonagle, notified the local Portsmouth and Chesapeake yellow page publishers that the Centers were not authorized to use AAMCO's name and marks.

91.    As a result of that letter, I have been denied access to any of the local yellow pages and was unable to place any ads in the current yellow pages for either of the Centers.

92.    As AAMCO is well aware, advertising in the local yellow pages is absolutely critical to maintaining the value of the Centers and is the primary source of new customers.

93.    By prohibiting me from advertising in the Yellow Pages, AAMCO has caused irreparable harm to my business and violated the franchise agreements.

94.    Not coincidentally, in October 2006, AAMCO completed the conversion of a former Cottman Transmission Center in Portsmouth, Virginia into an AAMCO Center.

95.    At the same time, AAMCO completed the conversion of a former Cottman Transmission Center in Chesapeake, Virginia into an AAMCO Center.

96.    The New Portsmouth AAMCO Center is owned and operated by Joseph Turkowski, and the center is less than a mile away from the Portsmouth Center.

97.    Even prior to the alleged termination of the Portsmouth Center, Mr. Turkowski, then a Cottman franchisee, told several of my employees at the Portsmouth Center that AAMCO was out to get me and warned my employees that they better have their resumes ready because AAMCO was closing the Portsmouth Center.

98.    Based on these statements and Mr. Turkowski's knowledge of events to come in 2006, it seems clear to me that AAMCO had always planned to terminate the Portsmouth Center to make room for the converted Cottman Center owned by Mr. Turkowski.

99.    Also, in a March 2006 meeting I attended, Todd Leff, the former president of Cottman and now president of AAMCO, announced that in the Virginia market serviced by the Centers there were 18 AAMCO centers servicing 1.6 million cars.

100.    Mr. Leff announced that AAMCO had determined that there was a need in the market for only one AAMCO center per 100,000 cars.

101.    Mr. Leff concluded that AAMCO had determined that there were 2 AAMCO centers too many in the market served by the Centers.

102.    Thus, it seems plain to me that the May 8th Termination Letters from AAMCO were a mere pretext to put into motion a decision that had previously been made by AAMCO to eliminate the Centers.

103.    Even after the purported termination of the Centers on June 9, 2006, AAMCO continued to treat the Centers as authorized AAMCO franchises until October 2006 when Mr. Turkowski's conversion to an AAMCO Center was complete and the new yellow page ads were published with Mr. Turkowski's AAMCO advertisements and telephone numbers.

104.    Despite the alleged termination on June 9th, AAMCO waited until January 19, 2007 to initiate the present suit that was filed initially in the Court of Common Pleas for Montgomery County, Pennsylvania.

105.    By letter dated February 7, 2006, Alan L. Poliner, Associate Counsel with AAMCO, served me with a copy of a Scheduling Order dated January 31, 2007 setting a hearing on AAMCO's petition for a preliminary injunction on Monday, February 12, 2007 at 10:30 a.m. in Montgomery County, Pennsylvania.

106.    On Thursday, February 8, 2007, I was able to retain counsel in Pennsylvania to represent me in the present matter.

107.    By a Federal Express packet delivered on the morning of Friday, February 9, 2007, my Pennsylvania counsel for the first time reviewed the pleadings filed by AAMCO in Montgomery County, Pennsylvania.

108.    In the afternoon of February 9, 2007, my Pennsylvania counsel with my consent removed this matter to this Court.

I hereby declare under penalty of perjury that the foregoing is true and correct and based on my personal knowledge of the facts described herein to which I am fully competent to testify.

James M. Dunlap

Sworn to and subscribed
before me this _u_ day
of March, 2007.

Notary Public   10-31-09

# EXHIBIT B



*TOTAL CAR CARE EXPERTS*

July 6, 2011

<u>Via email (mholm@williamsmullen.com) and U.S. Mail</u>

W. Michael Holm
Williams Mullen
8300 Greensboro Drive, Suite 1100
McLean, VA 22102

Re:    AAMCO Transmissions, Inc. v. James Dunlap
United States District Court for the Eastern District of Pennsylvania

Dear Mr. Holm:

I am in receipt of your letter dated June 28, 2011. I apologize for not responding sooner but I was out of the office on business last week and then took some vacation days.

Regarding the termination date of Mr. Dunlap's Chesapeake franchise, AAMCO Transmissions, Inc. ("AAMCO") does not agree with your contention that the expiration date is June 4, 2012. Although in August 1998 Mr. Dunlap was sent a renewal agreement, he never executed that agreement. Accordingly, the renewal agreement is not, and never was, an operative document between AAMCO and Mr. Dunlap. Instead, Mr. Dunlap and AAMCO have operated under the terms of the original franchise agreement dated June 5, 1981, the second 15 year term of which expired on June 5, 2011. Your statement that "the parties have operated in accordance with [the renewal agreement] for the last 13 years" is incorrect and is inconsistent with the interactions of the parties and positions that Mr. Dunlap has asserted in previous litigations with AAMCO. See, for example, the Affidavit of James S. Dunlap dated March 6, 2007 at paragraph 34 ("...
AAMCO allowed the [Chesapeake] franchise agreement to renew per its terms for an additional 15 year period, expiring in 2011."). In addition, in a settlement agreement between AAMCO and Mr. Dunlap dated July 11, 2007, Mr. Dunlap specifically acknowledged that the remaining term of the Chesapeake franchise expired on June 5, 2011. Finally, the Amendment Agreement dated November 14, 1988, which you included with your June 28, 2011 letter, specifically references "the Franchise Agreement dated June 5, 1981" as being the operative document between AAMCO and Mr. Dunlap (not the renewal agreement sent to Mr. Dunlap several months earlier, which never was executed). In short, it is clear that both AAMCO and Mr. Dunlap always have understood that the operative document between them relating to the Chesapeake center is the June 5, 1981 agreement and that, therefore, Mr. Dunlap's franchise rights expired on June 5, 2011.

With regard to the issue of arbitration, AAMCO contends that Mr. Dunlap's past actions have resulted in a waiver of the arbitration provision in the Amendment Agreement referenced in your June 28, 2011 letter. Specifically, in 2007, rather than invoking the arbitration provision, Mr. Dunlap filed counterclaims against AAMCO in Federal Court. That lawsuit eventually was settled and the present action is brought to enforce obligations that Mr. Dunlap expressly acknowledged and agreed to as part of that previous settlement, e.g., that his franchise rights for the Chesapeake center would terminate on June 5, 2011. Having himself invoked the jurisdiction of the Eastern District of Pennsylvania to assert claims against AAMCO, Mr. Dunlap cannot now complain when AAMCO seeks relief in the same venue.

Second, it is clear that the Eastern District of Pennsylvania has jurisdiction to consider AAMCO's pending request for injunctive relief. See, for example, *Ortho Pharmaceutical Corp. v. Amgen, Inc.*, 882 F.2d 806, 812-813 (1989). In the present instance, the arbitration process itself would result in delays that would irreparably harm AAMCO if, pending a decision by an arbitrator, Mr. Dunlap's unauthorized use of AAMCO's trademarks continued unabated.

Although AAMCO disagrees with Mr. Dunlap's contention that he has the right to demand that the pending disputes be submitted to arbitration, in the spirit of compromise, AAMCO would agree to submit the pending claims to arbitration provided that Mr. Dunlap agrees to the entry by the District Court of the preliminary injunction order that is the subject of AAMCO's pending motion. In this way the arbitration process would not serve as a mechanism for Mr. Dunlap to further injure AAMCO.

Sincerely,

James Goniea
Vice President & General Counsel

cc:    William B. Jameson