**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AAMCO TRANSMISSIONS, INC.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **JAMES DUNLAP,** | : | **No. 11-4009** |
| **Defendant.** | : | |

**<u>MEMORANDUM</u>**

**Schiller, J.**                                                                                                        **August 16, 2011**

Sometimes, a relationship must end. The issue now before this Court is whether that end has arrived for AAMCO Transmissions, Inc. ("AAMCO") and one of its franchisees, James Dunlap. Presently before the Court is AAMCO's motion for a preliminary injunction as well as Dunlap's motion to dismiss AAMCO's lawsuit and to compel arbitration. The Court held a hearing on August 9, 2011. For the reasons that follow, the Court will grant AAMCO's motion for a preliminary injunction but will stay this litigation and compel the parties to arbitrate their disputes.

## I.    BACKGROUND

AAMCO franchises and licenses the AAMCO name in the operation of transmission and general automotive repair centers throughout the United States and Canada. (AAMCO's Mot. for Prelim. Inj. Brian O'Donnell Aff. ¶ 5.) It has used the name AAMCO as its trade name, trademark, and service mark in connection with the operation of a network of transmission repair centers since at least 1963. (*Id*. ¶ 3.)

On June 5, 1981, Dunlap and AAMCO entered into a Franchise Agreement that permitted Dunlap to run an AAMCO transmission repair center at 1366 South Military Highway in

Chesapeake, Virginia.  (AAMCO's Mot. for Prelim. Inj. Ex. A [1981 Franchise Agreement].)  The

1981 Franchise Agreement lasted for a term of fifteen years.  (*Id*. ¶ 16.1.)  Furthermore, "[u]nless

either party gives written notice of its intention not to renew the agreement at least one (1) year prior

to the expiration of the fifteen (15) year term, then this Franchise shall be renewed for fifteen years."

(*Id*.)  If the parties renewed their agreement, Dunlap also agreed to execute a franchise agreement

of "the type then currently being used by AAMCO."  (*Id*. ¶ 16.1(b).)

Under the 1981 Franchise Agreement, Dunlap agreed to a number of terms if it terminated.

He consented to promptly pay AAMCO any money owed, "[i]mmediately and permanently

discontinue the use of the mark AAMCO and all similar names or marks, and of any other

designation tending to indicate that the Franchisee is an authorized AAMCO Franchisee," promptly

destroy or surrender all AAMCO signs, stationary, forms and advertising, promptly transfer to

AAMCO each telephone number listed under the AAMCO designation, and "[r]efrain from doing

anything that would indicate that Franchisee is or ever was an authorized AAMCO dealer."  (*Id*. ¶

19.1.)  Additionally, "Franchisee further agrees that for a period of 1 year following a termination

of this Agreement he will not directly or indirectly engage in the transmission repair business within

a radius of 10 miles of the subject center or of any other AAMCO center."  (*Id*. ¶ 19.1(g).)

On November 14, 1988, AAMCO and Dunlap executed an amendment to the 1981 Franchise

Agreement that included the following arbitration clause:

22.1    Mediation and Arbitration

(a) Non-binding mediation of disputes, controversies, or claims arising out of or
relating to this Agreement shall be conducted in Philadelphia, Pennsylvania or in
Chicago, Illinois, solely at Franchisee's option.

(b) All disputes, controversies or claims arising out of or relating to this Agreement

> shall be settled by binding arbitration in accordance with the Commercial Arbitration
> Rules of the American Arbitration Association or its successor except for termination
> by AAMCO which is based in whole or in part, upon the fraudulent acts of
> Franchisee of Franchisee's failure to deal honestly and fairly with any customer of
> the center or Franchisee's failure to accurately report his gross receipts to AAMCO.
> Arbitration shall be conducted in Philadelphia, Pennsylvania, unless otherwise agreed
> to by the parties.

(AAMCO's Prelim. Inj. Hr'g Ex. P2 [1988 Amendment].)  On August 31, 1998, Warren Berest,

AAMCO's manager of franchise administration, sent Dunlap a letter that included three copies of

a renewal franchise agreement for the Chesapeake, Virginia AAMCO center.  (Dunlap's Mem. in

Opp'n to AAMCO's Mot. for Prelim. Inj. [Dunlap's Opp'n] Ex. A [Berest Letter].)  The letter

directed Dunlap to sign two of the agreements, to initial them where indicated, and to return the two

signed copies to Berest.  (*Id.*)  The letter informed Dunlap that he should not sign the contracts until

September 2, 1998, "as that is when you will be legal to do so pursuant to your recent receipt of the

AAMCO disclosure material."  (*Id.*)  The franchise agreement enclosed with the Berest Letter

includes an amendment that reads:

> WHEREAS, the Franchise Agreement is dated September 2, 1998, which date is the
> effective date of the Agreement . . .
>
> 1.      The commencement date of the Franchise Agreement shall be June 5, 1997,
>         and the Agreement, if not sooner terminated pursuant to provisions thereof,
>         shall continue until June 4, 2012.

(Berest Letter.)

Neither AAMCO nor Dunlap have been able to locate a renewal agreement signed by either

party.  Thus, the record contains no indication that the renewal agreement was ever signed by Dunlap

or AAMCO, or initialed by Dunlap, nor is there evidence that Dunlap executed the amendment to

this purported renewal agreement.

3

The parties did not enjoy a smooth ride.  AAMCO contends that Dunlap often failed to meet his obligations as a franchisee, including paying fees and timely submitting sales figures. (O'Donnell Aff. ¶ 17.)  As a result, AAMCO informed Dunlap in June and August of 2006 that it was terminating their relationship.  (*Id.* ¶ 18.)  Dunlap ignored these communications and continued to operate the Chesapeake AAMCO center using AAMCO's trade name and marks.  (*Id.* ¶ 19.)

On January 18, 2007, AAMCO sued Dunlap to enforce the termination of the 1981 Franchise Agreement.  (AAMCO's Prelim. Inj. Hr'g Ex. P13 (2007 Compl.)  After Dunlap removed the case to federal court, the parties settled.  (AAMCO's Mot. for Prelim. Inj. Ex. B [Settlement Agreement].) According to the Settlement Agreement, AAMCO and Dunlap agreed to rescind the termination of Dunlap's franchise agreement for the Chesapeake, Virginia AAMCO center.  (*Id.*)  Additionally, as of July 11, 2007, "the AAMCO franchise agreements are reinstated for a period not longer than the remaining term of the respective AAMCO franchise agreements (November 29, 2008 for the Portsmouth, VA AAMCO center and June 5, 2011 for the Chesapeake, VA AAMCO center) for the limited purpose of permitting Mr. Dunlap to operate the centers so that they can be sold as AAMCO centers to third party purchasers."  (*Id.*)

Dunlap did not sell the Chesapeake AAMCO center.  (O'Donnell Aff. ¶ 22.)  And when June 5, 2011 rolled around, he continued to operate it.  (*Id.* ¶ 23.)  On June 13, 2011, AAMCO sent a letter to Dunlap informing him that his franchise had expired and that he "was no longer authorized to operate an AAMCO center at the location." (AAMCO's Mot. for Prelim. Inj. Ex. C [Termination Letter].)   AAMCO demanded that Dunlap:  (1) stop using the AAMCO mark; (2) destroy or surrender AAMCO signs, stationary and forms; (3) stop advertising as an AAMCO franchisee; (4) transfer to AAMCO his business telephone number; (5) refrain from doing anything that would

4

indicate that he is or was an authorized AAMCO franchisee; (6) honor his non-compete clause; and (7) pay AAMCO any money he owed.  (*Id*.)

This letter failed to kick Dunlap into gear.  He has not removed the AAMCO name and trademark from the Chesapeake center and has continued to operate it using the AAMCO name.[1] (O'Donnell Aff. ¶¶ 24-25.) He also operates and controls a website that identifies his business as "AAMCO Transmissions."  (*Id*. ¶ 26; AAMCO's Prelim. Inj. Ex. P10, P11, & P12 [Advertisements].)  He continues to use the telephone number linked to AAMCO and use AAMCO repair orders that purport to provide customers with an AAMCO warranty.  (O'Donnell Aff. ¶¶ 27; AAMCO's Mem. of Law in Supp. of Prelim. Inj. Mot. at 7.)

Dunlap has a different take on matters.  According to Dunlap, AAMCO's associate general counsel, Karen von Dreusche, wrote to him in August of 1998, informing him that although AAMCO "continues to dispute the term of your franchise," the company recognized that Dunlap asserted that he was "currently operating at the [Chesapeake location] under a 15 year renewal of your original Franchise Agreement dated June 5, 1981."  (Supplemental Dunlap Decl. Ex. A [Von Dreusche Letter].)  The von Dreusche Letter stated that Dunlap was in default even if the 1981 Franchise Agreement renewed as Dunlap claimed.  (*Id*.)  The von Dreusche Letter indicated that she was also enclosing a copy of the form of the franchise agreement Dunlap would be obligated to sign. (*Id*.)

Dunlap also contends that the parties agreed to renew their franchise agreement in 1998, and that that agreement extended Dunlap's right to operate an AAMCO franchise at the Chesapeake

---

[1] Dunlap's Chesapeake AAMCO is currently located at 1330 South Military Highway, which is down the street from the original location.

location until June 4, 2012.  (Dunlap's Opp'n at 3.)  According to Dunlap, the parties have operated

under the terms of the renewed franchise agreement since 1998.  (*Id*. at 3-4.)  As for the Settlement

Agreement, Dunlap points out that it reinstated the existing 1998 Franchise Agreement; the

Settlement Agreement simply "misstates the duration of . . . the Chesapeake Franchise."  (*Id*. at 4.)

## II.    DISCUSSION

### A.    Preliminary Injunction in the Context of a Motion to Compel Arbitration

The arbitration clause included in the unsigned 1998 renewal agreement document is

identical to the arbitration clause included in the 1988 Amendment Agreement to the 1981 Franchise

Agreement.  It therefore does not matter which clause the Court applies.  The arbitration clause is

broad and AAMCO has not argued that the dispute between the parties falls outside the scope of the

arbitration agreement.

Dunlap argues that this Court must enforce the arbitration provision of the parties' agreement

and should therefore dismiss AAMCO's lawsuit to allow an arbitrator to ultimately decide when the

parties' relationship expires.  AAMCO responds that this litigation "is a continuation of the 2007

Litigation" and because Dunlap did not seek to arbitrate that dispute, he has waived his right to

arbitrate this dispute.  (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss and Compel Arb.

[Pl.'s Arb. Opp'n] at 4-7.)

AAMCO's opposition to Dunlap's motion to dismiss and to compel arbitration recounts the

history of the 2007 litigation between the parties.  (Pl.'s Arb. Opp'n at 1-4.)  AAMCO notes that it

filed a lawsuit against Dunlap in 2007 in Pennsylvania state court to end its relationship with Dunlap.

(*Id*. at 1.)   Dunlap subsequently removed the case to federal court, filed an answer and a

counterclaim, responded to a preliminary judgment motion, and engaged in extensive discovery before settling the matter.  (*Id.* at 2-3.)  In the four and a half years since this dispute began, Dunlap did not seek to arbitrate this dispute until AAMCO filed another motion for a preliminary injunction after Dunlap failed to abide by the settlement agreement.  (*Id.* at 4.)

AAMCO's argument would have more force if it brought this action as one to enforce the Settlement Agreement.  But until Dunlap filed a motion to dismiss and to compel arbitration, AAMCO did not fashion this lawsuit as a continuation of the 2007 litigation.  It did not mark the lawsuit as related to the 2007 litigation, nor does AAMCO's  Complaint indicate that this lawsuit is simply a vehicle to force Dunlap to comply with his 2007 promise to cease operating his Chesapeake AAMCO center.

Dunlap's attempt to force arbitration does not preclude injunctive relief in favor of AAMCO, however.  The Court may issue a preliminary injunction even if the parties have agreed to arbitrate their dispute, "provided that the traditional prerequisites for such relief are satisfied." *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 812 (3d Cir. 1989).  Dunlap also argues that a preliminary injunction is not warranted, in part because it would change the status quo between the parties. (Dunlap's Opp'n. at 6-7.)  But the Third Circuit has rejected the argument that a district court may only issue a preliminary injunction in an arbitrable dispute to preserve the status quo. *Ortho Pharm.*, 882 F.2d at 813.  Rather, if one party is being irreparably harmed by the status quo and thereby threatens to nullify the arbitration process, a district court must alter the status quo to stop the injury. *Id.* at 814.  Thus, this Court is not bound to permit an irreparable injury to continue in the name of stasis.  Furthermore, Dunlap's belief that issuing the preliminary injunction would alter the status quo is based on his perception of events.  If Dunlap was obligated to turn over the keys to the

Chesapeake AAMCO center because the franchise agreement expired, he cannot hide behind the status quo as his reason for continuing to operate an unauthorized AAMCO center. If an agreement that ended in 2011 defined the status quo, it is Dunlap who is changing the terms of the deal.

Here, preliminary injunctive relief is required to prevent Dunlap from wrongly operating as a franchisee and potentially damaging the reputation of AAMCO and confusing customers. If Dunlap is not enjoined, the arbitration will likely not be able to decide the key issue raised by AAMCO's preliminary injunction motion in a timely fashion: whether Dunlap continues to wrongly hold himself out as an AAMCO franchisee.

### B.     Preliminary Injunction

AAMCO seeks a preliminary injunction to, *inter alia*, force Dunlap to cease operating the Chesapeake AAMCO center. A court must examine the following four factors when faced with a request for a preliminary injunction: (1) plaintiff's likelihood of success on the merits; (2) irreparable harm; (3) the extent to which the defendant will be irreparably harmed if the injunction issues; and (4) the public interest. *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 803 (3d Cir. 1998).

### 1.     Likelihood of success on the merits

#### a.     *Trademark infringement*

To establish a trademark infringement claim, a plaintiff must prove that: (1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods and services is likely to create confusion concerning the origin of the goods or services. *Opticians Ass'n of Am. v. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990). A likelihood of confusion exists if "consumers viewing the mark would probably assume that the

product or service it represents is associated with the source of a different product or service identified by a similar mark." *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir. 1978). Ordinarily, a court would apply the factors set forth in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983) to determine if a likelihood of confusion exists. Here, however, Dunlap is using AAMCO's mark. Obviously, the likelihood of confusion is great when the infringer uses the plaintiff's trademark. *See Opticians Ass'n*, 920 F.2d at 195 ("Thus, likelihood of confusion is inevitable when . . . the identical mark is used concurrently by unrelated entities.") (citing *United States Jaycees v. Phila. Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981)).

AAMCO claims that Dunlap is infringing on its trademarks by continuing to use the marks despite the termination of the 1981 Franchise Agreement. Dunlap counters that he is not infringing AAMCO's marks because his franchise rights remain in effect until 2012. Thus, AAMCO's right to injunctive relief depends upon its ability to show that its termination of the parties' 1981 Franchise Agreement was proper. *See S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992) ("Once a franchise is terminated, the franchisor has the right to enjoin unauthorized use of its trademark under the Lanham Act. Thus, Jiffy Lube will merit preliminary injunctive relief if it can adduce sufficient facts indicating that its termination of Durst's franchises was proper.").

All of the evidence points to the relationship between the parties ending in 2011. The original Franchise Agreement was signed in 1981 and lasted for fifteen years. Because it was not terminated in accordance with its terms, it automatically renewed for another fifteen year period. That period expired in 2011. The Settlement Agreement signed by AAMCO and Dunlap confirms that the once-renewed 1981 Franchise Agreement ended in 2011; it reinstated their franchisee/franchisor relationship for a period not to exceed the original duration of the 1981

9

Franchise Agreement.  There is no evidence that the 1998 renewal agreement that was sent to Dunlap was ever signed by either party or that the parties were operating under that agreement despite Dunlap's characterization of the June 5, 2011 termination date in the Settlement Agreement as an "incorrect recital[] of extrinsic facts" with "no independent legal effect."  (Dunlap's Opp'n at 9.)

Dunlap's argument that the date of termination in the Settlement Agreement is an error is convenient but unsupported by the record.  Furthermore, Dunlap offered no indication between the date of the Settlement Agreement, July 11, 2007, and the commencement of this lawsuit that the Settlement Agreement contained an error prematurely ending his right to operate the Chesapeake location.  AAMCO's contention that the parties' agreement ended in 2011 is bolstered by Dunlap's statement in the 2007 litigation that the agreement ended in 2011.  (AAMCO's Prelim. Inj. Reply Ex. A [Mar. 2007 Dunlap Aff.] ¶ 34 ("AAMCO allowed the franchise agreement to renew per its terms for an additional 15 year period, expiring in 2011.").)

Dunlap believes that the von Dreusche Letter supports his contention that the agreement ends in 2012.  (Supplemental Dunlap Decl. ¶¶ 1-2.)  The Court is unpersuaded.  AAMCO referenced its dispute with Dunlap about the term of the franchise, although it did so "without waiver of any of the previous positions asserted by [AAMCO] regarding the renewal of this franchise and solely on the basis of attempting to settle the dispute between you and [AAMCO] regarding this issue."  (Von Dreusche Letter.)  The letter indicates that AAMCO was willing to accede to Dunlap's request for a fifteen-year renewal of the 1981 Franchise Agreement.  The Settlement Agreement and Dunlap's statement in his March 2007 declaration are consistent with the renewal of the 1981 Franchise Agreement for an additional fifteen years, to end in 2011.  This termination date is also consistent with the terms of the 1981 Franchise Agreement, which allowed for automatic renewal.  A 2012

10

termination date is not consistent with any of these documents.

Furthermore, a 2012 termination date is based on a commencement date of June 5, 1997, which would leave a one-year gap between the end of 1981 Franchise Agreement and the start of the purported renewal agreement.  This gap is unexplained by Dunlap and contradicts his position that the 1981 Franchise Agreement "would automatically renew for the period of fifteen years unless either party gave the other one year notice of the intent to not renew."  (Dunlap Decl. ¶ 4.)  Under Dunlap's current theory, the renewal agreement would not be an automatic renewal but would be a new franchise agreement.  Dunlap is left relying on an unsigned franchise agreement that is contradicted by everything in the record and AAMCO's clear desire to end its relationship with Dunlap as quickly as possible.

The Settlement Agreement supports AAMCO's argument that the 1981 Franchise Agreement renewed for another fifteen years because AAMCO failed to terminate it in accordance with its terms.  Those fifteen years expired in 2011, and therefore the Settlement Agreement is in alignment with the 1981 Franchise Agreement and its automatic renewal.  The parties agreed to terminate their relationship involving Dunlap's Chesapeake AAMCO center by June 5, 2011.[2]

---

[2] AAMCO raises another reason why Dunlap should not be allowed to argue that the parties' relationship ends in June of 2012:  because Dunlap has stated that it ends in June of 2011 in a prior legal proceeding.  (AAMCO's Prelim. Inj. Reply at 1-4.)  Therefore, the Court should apply the doctrine of judicial estoppel.

A party may not assume one position in a legal proceeding, only to later assume a contrary position because the party's interests have changed.  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  In the Third Circuit, the doctrine may be applied if:  (1) the party's positions are irreconcilably inconsistent; (2) the change in position was taken with the intent to deceive the court; and (3) no lesser sanction would adequately remedy the damages by the litigant's misconduct.  *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003).  Courts may apply judicial estoppel even if the party's contrary position was taken in prior litigation.  *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996).

Having determined that the Franchise Agreement expired in 2011, the Court concludes that

AAMCO was within its rights to demand that Dunlap comply with his obligations upon termination

of their relationship, including surrendering items that included AAMCO's marks.  *See Jiffy Lube*,

968 F.2d at 375. Because he continues to use AAMCO's marks in operating the Chesapeake

AAMCO center, consumers are likely to believe that Dunlap is an acting as an authorized AAMCO

franchisee and will mistakenly assume that the products and services he supplies are associated with

AAMCO.  *See Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*, 834 F. Supp. 683, 690 (D.N.J. 1993).

### b.    Non-compete agreement

The 1981 Franchise Agreement includes a non-compete clause, which prohibits Dunlap from

"doing anything that would indicate that Franchisee is or ever was an authorized AAMCO dealer.

Franchisee further agrees that the for a period of 1 year following a termination of this Agreement

he will not directly or indirectly engage in the transmission repair business within a radius of 10

miles of the subject center or of any other AAMCO center."

Under Pennsylvania law, a non-compete covenant is enforceable if:  (1) the covenant relates

to either a contract for the sale of goodwill or other subject property; (2) the covenant is supported

by adequate consideration; and (3) the application of the covenant is reasonably limited in both time

and territory.  *Piercing Pagoda, Inc. v. Hoffner*, 351 A.2d 207, 210 (Pa. 1976).

Dunlap argues that because he continues to legally operate the Chesapeake AAMCO center,

---

Although Dunlap's positions regarding the termination date of the Chesapeake AAMCO
center cannot be reconciled, and the Court is concerned that Dunlap's change in position evinces
a desire to avoid the fact that the parties' agreement has expired (a concern bolstered by Dunlap's
choice to make his arguments via unsworn declarations rather than through testimony subject to
cross examination), the application of judicial estoppel is unnecessary here because the record
clearly demonstrates AAMCO is entitled to injunctive relief.

12

he has not violated the non-compete agreement.  The Court has already rejected this argument.

Furthermore, the covenant relates to a contract for the sale of goodwill or other property and was

supported by adequate consideration.  This non-compete clause is also reasonable in time.  The non-

compete clause lasts for one year and applies only to the transmission repair business.  *See Rita's*

*Water Ice Franchise Co. v. S.A. Smith Enters., LLC*, Civ. A. No. 10-4297, 2011 WL 101694, at *7

(E.D. Pa. Jan. 11, 2011) (two-year non-compete covenant deemed reasonable); *Maaco Franchising,*

*Inc. v. Augustin*, Civ. A. No. 09-4548, 2010 WL 1644278, at *3 (E.D. Pa. Apr. 20, 2010) ("Given

the time needed to bring a franchise up to speed and to protect the franchisor's interests, I find the

one-year term to be reasonable"); *Athlete Foot's Mktg. Assocs. v. Zell Inv., Inc.*, Civ. A. No. 00-186,

2000 WL 426186, at *11 (W.D. Pa. Feb. 17, 2000) (one-year covenant "clearly reasonable" under

Pennsylvania law).

      The ten-mile radius, however, is not reasonable because it would prohibit Dunlap from

operating a transmission center within ten miles of any AAMCO center.  Such a restrictive covenant

would apply across the United States and Canada.  Pennsylvania courts will modify, or blue pencil,

non-compete agreements if the restriction is too broad but the franchisor is entitled to some

protection.  *See Sidco Paper Co. v. Aaron*, 351 A.2d 250, 254 (Pa. 1976); *Hillard v. Medtronic, Inc.*,

910 F.Supp. 173, 177 (M.D. Pa. 1995). The Court will therefore limit the geographic scope of the

covenant to within ten miles of the Chesapeake, Virginia AAMCO center located at 1330 South

Military Highway in Chesapeake, Virginia.  *See AAMCO Transmissions, Inc. v. Graham*, Civ. A.

Nos. 89-4976 & 89-6379, 1990 WL 118050, at *3 (E.D. Pa. Aug. 9, 1990) ("In the instant case we

find that the terms of the restrictive covenant are unduly burdensome on the Grahams in only one

respect. The covenant restricts them from operating a center anywhere that Aamco has an existing

13

center. We find that this geographic restriction is overly broad. We, therefore, will limit its application to the Denver and Aurora metropolitan areas.")

A ten-mile geographic prohibition from the site of the Chesapeake, Virginia AAMCO center is reasonable, as opposed to ten-miles from any AAMCO center. *See Augustin*, 2010 WL 1644278, at *3 (ten-mile radius from location of franchisee's location reasonable in geographic scope but declining to decide if ten-mile radius from all Maaco franchises would be reasonable); *Sparks Tune-Up, Inc. v. White*, Civ. A. No. 89-664, 1989 WL 41321, at *3 (E.D. Pa. Apr. 18, 1989) (enforcing non-compete clause that forbade franchisee from operating franchise within ten-mile radius of center franchisee operated at time agreement was terminated).

### 2.    Irreparable Harm

To meet its burden to demonstrate irreparable harm, the plaintiff must show that it will experience harm that cannot adequately be compensated by monetary damages. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill," as well as the possibility of confusion. *Pappan Enters.*, 143 F.3d at 805 (citing *Opticians*, 920 F.2d at 195-96).

Dunlap argues that AAMCO has failed to show irreparable harm because it makes no claim that Dunlap will damage AAMCO's reputation in the industry or that "by continuing to operate this 30-year-old AAMCO franchise during the pendency of this litigation, Dunlap will do anything to damage AAMCO's reputation." (Dunlap's Opp'n at 11.)  As Dunlap sees this case, he is having a contract dispute with AAMCO that can be resolved through arbitration.

The fact that Dunlap believes he runs a high-performing AAMCO center does not foreclose a preliminary injunction.  The availability of injunctive relief depends upon the terms of the parties'

14

agreement, not the economic success of the business.  The relationship between these parties is over and AAMCO does not have to held in the clutches of a former franchisee.  AAMCO is not obligated to put its reputation on the line for the sake of a former franchisee.  As long as Dunlap operates the Chesapeake AAMCO station, customers will mistakenly believe that the work performed on their vehicles is by a qualified and authorized AAMCO representative.

As for the non-compete agreement, "[a] franchisor's business reputation is irreparably harmed when a former franchisee continues to operate at a franchise location after the expiration of a franchise agreement in violation of a non-compete clause." *S.A. Smith Enters.*, 2011 WL 101694, at *8 (citing *Athlete's Foot*, 2000 WL 426186, at *11).  Operating a competing shop will irreparably harm AAMCO because it will hamper AAMCO's ability to secure another franchise in the same territory.  *Rita's Water Ice Franchise Corp. v. DBI Inv. Corp.*, Civ. A. No. 96-306, 1996 WL 165518, at *4 (E.D. Pa. Apr. 8, 1996) (citing *Piercing Pagoda*, 351 A.2d at 212.).  There was testimony at the preliminary injunction hearing that Dunlap's continued operation at the Chesapeake location has interfered with AAMCO's attempts to franchise the location to a current franchisee.  AAMCO's inability to enforce its non-compete agreement against Dunlap also risks lowering the value of all of its franchises.  *See DBI Inv.*, 1996 WL 165518, at *5 ("If plaintiff is unable to enforce this restrictive covenant against these defendants . . . [o]ther franchisees might violate their franchise agreements in similar ways and use [the plaintiff's] good will to establish competing businesses.").

Finally, because Dunlap is not authorized to operate an AAMCO center, he is unfairly competing with those franchisees AAMCO has authorized to do business under its name.  *See S.A. Smith Enters.*, 2011 WL 101694, at *8 ("Irreparable injury results when a former franchisee competes against a franchisor in breach of a restrictive covenant contained in the parties' franchise

agreement."). Moreover, Dunlap still has AAMCO's proprietary software, manuals and other materials that include AAMCO's marks and trade secrets. (O'Donnell Aff. ¶¶ 34-36.) This information will provide him with an unfair advantage against his former franchisor.

3.     **Balance of the Harms**

The Court must balance the hardship to the parties to ensure that issuing the injunction will not harm the infringer more than denying the injunction will harm the mark's owner. *Pappan Enters.*, 143 F.3d at 805.

Dunlap claims that the balance of the harms favors him because an injunction "would have disastrous effects on Dunlap's Chesapeake business." (Dunlap's Opp'n at 14.) The Court appreciates that a preliminary injunction will force Dunlap to cease operations as an AAMCO franchisee and will have financial repercussions for Dunlap and his employees. But these are self-inflicted wounds. *See Pappan Enters.*, 143 F.3d at 805-06 (finding balance of harms favored franchisor because franchisee's difficulties were brought on by its own conduct in continuing to use marks despite termination of franchise agreements). The Settlement Agreement states that the 1981 Franchise Agreement was reinstated "for the limited purpose of permitting Mr. Dunlap to operate the centers so that they can be sold as AAMCO centers to third party purchasers." (Settlement Agreement.) Additionally, this has been a tumultuous relationship marred by litigation. Thus, the Court disagrees with Dunlap's characterization that this is a case in which a franchisee is being forced to shed its franchise affiliation overnight. (Dunlap's Opp'n at 13.) Moreover, under Dunlap's theory of the case, the Franchise Agreement will expire on June 4, 2012. Accordingly, his affiliation with AAMCO will end only ten months earlier than he anticipated based upon his incorrect interpretation of the 1981 Franchise Agreement. Finally, the non-compete clause allows Dunlap to

run a competing business provided it is not within a certain distance of the Chesapeake AAMCO center or does not repair transmissions. Thus, Dunlap can operate a business at his current location. *See DBI Inv.*, 1996 WL 165518, at *5 (balance of harms did not favor franchisee when restrictive covenant did not force him out of business at present location).

### 4.    Public Interest

The public interest is served in a number of ways by granting a preliminary injunction. First, customers will not be deceived or confused into believing that Dunlap is authorized to operate the Chesapeake AAMCO center. *See Pappan Enters.*, 143 F.3d at 807 (noting that in a trademark case, public interest is often synonymous with right of public not to be confused) (citing *Opticians*, 920 F.2d at 197). Second, the public interest is also served by ensuring the contractual rights and obligations of the parties are upheld. *See S.A. Smith Enters.*, 2011 WL 101694, at *9. Third, "the public interest is served by . . . maintaining the viability of franchise systems." *Augustin*, 2010 WL 1644278, at *4.

### C.    Security Bond

Rule 65(c) directs that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Given the evidence submitted regarding the total gross sales of the Chesapeake AAMCO center, the Court will require AAMCO to post a bond of $100,000.

### D.    Motion to Compel Arbitration

Dunlap throws an additional monkey wrench into AAMCO's request for a preliminary injunction: he argues that AAMCO's case should be dismissed because the arbitration clause of the

parties' agreement — the 1998 renewal agreement according to Dunlap — requires the issue of the termination date of the franchise agreement to be submitted to arbitration.

The Federal Arbitration Act ("FAA") provides that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Any "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id.* § 4. The FAA establishes the strong federal policy in favor of arbitration. *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 178 (3d Cir. 2010).

A district court decides a motion to compel arbitration under a summary judgment standard and gives the party opposing the motion the benefit of all reasonable doubts and appropriate inferences. *Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 620 (3d Cir. 2009). Before compelling arbitration, a court must determine that: (1) a valid agreement to arbitrate exists; and (2) the particular dispute falls within the scope of the agreement. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009).

AAMCO does not dispute that a valid agreement to arbitrate exists, nor does it indicate that this particular dispute falls outside the scope of the agreement. Rather, AAMCO argues that Dunlap waived his right to arbitrate this matter and that it will be prejudiced if forced to arbitrate.

Whether a party's litigation conduct constitutes a waiver of the right to compel arbitration is a matter for the court to decide. *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 220 (3d Cir. 2007). "[P]rejudice is the touchstone for determining whether the right to arbitrate has been waived." *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 925 (3d Cir. 1992). Waiver will

ordinarily only be found if the demand to arbitrate came long after the lawsuit commenced and the parties engaged in extensive discovery. *Nino v. Jewelry Exch.*, 609 F.3d 191, 208 (3d Cir. 2010). Courts looks at the following factors when faced with an issue of possible waiver of arbitration rights:  (1) the timeliness of a motion to arbitrate; (2) the degree to which the party seeking to compel arbitration has contested the merits of its opponent's claims; (3) whether that party has informed its opponent of its intention to seek arbitration even if a motion to stay court proceedings has yet to be filed; (4) the extent of its non-merits motion practice; (5) its assent to the district court's pretrial orders; and (6) the extent to which both parties have engaged in discovery. *Hoxworth*, 980 F.2d at 926-27.  Whether the right to arbitrate has been waived depends on the circumstances and context of the case and ultimately must answer whether the party seeking to compel arbitration has "acted inconsistently with the right to arbitrate."  *Nino*, 609 F.3d at 209 (quoting *St. Mary's Med. Ctr. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 588 (7th Cir. 2002)).

This Court may consider the question of waiver "whenever a party seeking arbitration has engaged in any prior litigation" *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 456 n.12 (2d Cir. 1995); *see AXA Versicherung AG v. N.H. Ins. Co.*, 708 F. Supp. 2d 423, 432 (S.D.N.Y. 2010) (review of waiver issue "is not confined to the history of this litigation alone; the waiver inquiry also encompasses 'prior litigation of the same legal and factual issues as those the party now wants to arbitrate'") (quoting *PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 108 n.2 (2d Cir. 1997)).

There are similarities between the 2007 litigation between AAMCO and Dunlap and this litigation.  Without question, Dunlap fully engaged the litigation process in the 2007 litigation.  Here, however, he has sought to compel arbitration at an early stage in the proceedings.  Furthermore, by

filing a separate action in this Court, AAMCO has shown that this litigation differs from the parties' previous dispute.  Most importantly, because the Court is granting a preliminary injunction in favor of AAMCO, it will suffer no prejudice by arbitrating  any remaining issues with Dunlap.  The fact that Dunlap will be enjoined from operating the Chesapeake AAMCO center pending arbitration will prevent him from using arbitration to draw out this dispute.

### III.    CONCLUSION

It is the end of the road for Dunlap's operation of the Chesapeake AAMCO center.  The Court will enjoin Dunlap from operating as an AAMCO franchisee at Chesapeake location. Although the Court will not dismiss AAMCO's case as requested by Dunlap, it will stay this litigation while the parties arbitrate their disputes, including a final determination of when the 1981 Franchise Agreement terminated.  An Order consistent with this Memorandum will be docketed separately.