IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA


-------------------------------------------
AAMCO TRANSMISSIONS, INC
      Plaintiff,

      v.                     No.2:11-cv-04009-BMS

JAMES M. DUNLAP
      Defendant
-------------------------------------------


**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO CONVERT THE PRELIMINARY INJUNCTION INTO A PERMANENT   INJUNCTION AND TO EXONERATE THE INJUNCTION BOND   AND IN SUPPORT OF THE MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION AND REMOVE THE STAY OF PROCEEDING**

Defendant James M Dunlap, Pro Se, sets forth this Memorandum of Law in support of his opposition to the Motion to Convert the Preliminary Injunction into a Permanent Injunction and to Exonerate the Injunction Bond as follows:

1. **Introduction**

In the memorandum issued by the Honorable Judge Berle Schiller on August 16, 2011, Judge Schiller concludes that it is the end the road for Dunlap's operation of the Chesapeake AAMCO center. The actual demise of the relationship between AAMCO Transmissions, Inc (AAMCO) and James M. Dunlap occurred on March 6, 2006. At separate Webinars shown to the franchisees of Cottman Transmissions and AAMCO

1

Transmissions, an announcement was made that the two long-time rivals were to be merged into a single unit. The Cottman brand was to be abandoned. Existing Cottman dealers were to be converted to the AAMCO brand. Because Dunlap owned two centers in close proximity to Cottman centers, he was an obstacle to the conversion process.

On the notorious day, Keith Morgan, the son of the spiritual founder of AAMCO turned his back on the 800 franchisees who had made his family wealthy and sold the corporation. Keith Morgan had been afforded a life of luxury and education at the finest schools. He offered the franchisees no advance notice nor was there any effort to obtain input from the franchisees. These franchisees were sold down the river by Mr. Morgan.

This event occurred less than one year after the passing of his father, Robert Morgan. In various interviews with the new president of AAMCO, Todd Left, the impression is given that Leff and Morgan began negotiating the sale of the business within hours of Robert Morgan's death. There are various representations as to the series of events that led to the sale. Bram Hall of WilliamsHarris, a private investment firm, stated that in September 2006 Keith Morgan put AAMCO on the auction block. The ultimate event was the sale of AAMCO to American Capital and Strategies (ACAS).

American Capital and Strategies is a business development company (BDC) charted under the Small Business Investment Act of 1940. This act was amended in 1980 and provided the foundation for the growth of the business development companies that exist today. The lucrative nature of the business development company is notable. It has been recognized by such powerhouses of private equity as Bain Capital, Carlyle Capital, and Blackstone Capital. It is equally notable that Warren Buffett, the Oracle of Omaha, has expressed concerns over the negative financial impact that these companies have had

on the economy through their structured fees and disregard for the long term health of the companies that they influence.

The business development company is a unique entity. Very few attorneys, investors, or laymen have any knowledge of the 1980 Act. These BDC companies were intended to provide financial assistance and make funds available to small businesses that would not qualify for traditional business loans. A second element of the Small Business Development Act of 1980 was that these companies were to provide "significant managerial expertise" to the companies that they controlled. The business development companies were required to include at least one of their employees on the Board of Directors of any company that they controlled.

In an article in "Corporate Counsel Magazine", Samuel Flax, the general counsel of American Capital refers to AAMCO and Piper Aircraft as two of the better known control companies.

In recent months, the BDC's have attempted to deny their influence and control over the control companies. Micromanagement of the control companies has resulted in litigation in which the BDC's are held accountable for failures of these companies. These companies have come under closer scrutiny by the Securities and Exchange Commission (SEC).

On March 6, 2006, there were approximately 300 Cottman centers and approximately 800 AAMCO centers in operation. With the decision to convert Cottman centers to the AAMCO brand came conflicts. In many cases the competing centers were in close proximity to the one another. The new owners of AAMCO failed to treat the franchisees as partners and recognize that the eleven hundred franchisees had invested

approximately $300 million in tangible assets necessary to provide services to the vehicles that came to their shops. Todd Leff participated in the decision to execute the conversion process by force, threats and intimidation, misinformation and false statements. Numerous Cottman dealers made bad decisions when they converted to the AAMCO brand. The franchise disclosure documents that AAMCO has produced since 2007 are of questionable accuracy.  It does appear that 125 Cottman centers were converted.  Approximately 25 of those conversions remain active today. Of an aggregate of approximately 1,100 centers, there are now under 700 AAMCO centers and possibly 50 Cottman centers that have survived.

       This declining performance would indicate that ACAS has failed to provide significant managerial experience as demanded by the statutory regulations under which it operates.  During the arbitration proceedings, AAMCO presented a declaration by ACAS associate counsel, Vivian French.   Ms. French characterizes the relationship between AAMCO and ACAS as nothing more than one who has invested in the company.  Her statement minimizes the fact that ACAS owns 100% of the stock of AAMCO.  This depiction is made absurd when one looks at the composition of the Board of Directors and the recent involvement of ACAS employees in the day-to-day operations of AAMCO Transmissions.

       On March 6, 2006, The Board of Directors of AAMCO Transmissions was composed of six individuals.  Four of these were employees of ACAS.  It is believed that at all times ACAS maintained a controlling interest in any decision made by the Board of Directors.   Brett Bero assumed the duties of interim president of AAMCO.  In Mr. Bero's introductory statement to the franchisees he acknowledged that it is a common

practice of American Capital to insert their people into the control companies in order to give them direction. More recently, Jim Gregory, an employee of ACAS became the interim financial officer for AAMCO Transmissions. Mr. Gregory appeared to be on the fast track at ACAS. He recently resigned his position in ACAS to become the full-time CFO at AAMCO. There is clearly reason to question the wisdom and sincerity of that decision unless it is merely a ploy for Mr. Gregory to avoid the appearance of control by ACAS.

The declaration of Ms. French is in direct contrast to the statement previously noted by Samuel Flax. In a presentation made by ACAS president, Milan Wilkus, he noted that it is common for ACAS to control the companies. He states that the companies are referred to as portfolio companies because of the statutory regulations, but that they are actually companies that ACAS controls. Wilkus went on to reaffirm that they place their people in these businesses and that they control the businesses. Recent actions by the SEC have caused ACAS to downplay their involvement. However, the statements were made to an audience of the banking industry and investors. These presentations are designed to enhance the image of the company.

Most recently Mr. Wilkus noted that the abysmal performance of ACAS was due to the poor performance of one specific portfolio company. The value of the common stock of that company has been reduced to zero on the financial reports that ACAS submits to the Securities and Exchange Commission. Mr. Wilkus went on to describe the company and indicate that they recently put their people in place in the company and that they've hired a new CEO with industry experience. It takes very little effort to recognize

that the company that Wilkus refers to is AAMCO Transmissions. The employees inserted into the company are Brett Bero and Jim Gregory. The new president is Brett Ponton.

James M. Dunlap became a franchisee of AAMCO Transmissions in September 1978. Prior to entering into the agreement with AAMCO Transmissions, Dunlap was employed as a factory representative of the Ford Motor Company. In this capacity Dunlap was introduced to and assisted franchisees of the Ford Motor Company in the operation of their Parts and Service Departments. In addition to the day-to-day exposure of the best and worst practices of the Parts and Service Departments, Dunlap was trained by Ford Motor Company. Dunlap received specialized training in Dearborn, Michigan, as part of an advanced program

Prior to employment with Ford Motor Company, Dunlap served in the United States Army as an officer in the U.S. Army Adjutant Generals Corps. After serving at a Brigade Headquarters as a second lieutenant, he was placed in charge of the brigade personnel office. Dunlap oversaw the operation of the department. He supervised numerous enlisted men with ranks from E2 to E8. Upon separation from the United States Army, Dunlap was awarded the Army Commendation Medal for meritorious service. This is a distinct honor because few junior officers receive such recognition during peacetime.

Dunlap possesses a Masters Degree in Business Administration and has an Undergraduate Degree in Economics. Dunlap graduated from college with honors.

Dunlap has a strong mechanical background and an intense enjoyment of motorized vehicles. Dunlap has the ability to rebuild and repair all components of an automobile. He has personally restored vehicles. Dunlap's understanding of the mechanical properties of motor vehicles and, in particular, suspensions dynamics led Dunlap to sports car racing. Dunlap was a Northeast Division Champion of the Sports Car Club of America in the most highly contested class of racing. Dunlap's appreciation and expertise of the automotive industry spans many venues.

### 2. Factual and procedural history

### A. The history of the Parties

In 1978 Dunlap signed an agreement to operate an AAMCO center in Portsmouth, Virginia. In 1981 Dunlap and partner Russell Blackburn, a former Ford employee, entered into an agreement to operate an AAMCO center in Chesapeake, Virginia. Prior to the opening of the center, Mr. Blackburn experienced marital difficulties. The pressure of divorce proceedings caused Mr. Blackburn to withdraw from the business.

Dunlap operated the two successful AAMCO centers for over 30 years. During that time period, Dunlap can recall no instance where he contacted AAMCO upper management for assistance. AAMCO Transmissions was a stagnant corporation.

Out of the 1979 AAMCO training class that Dunlap attended, Dunlap was the longest surviving operator. It is believed that only four dealers completed the first 15

year term.  The Small Business Administration has found that the current AAMCO franchise has one of the highest failure rates of the major companies to which it provides funding

### B. The Arbitration Decision

The arbitration between the two parties resulted in a decision that the 1981 contract was the controlling document.  The plaintiffs proudly highlight the section of the arbitration award that states:

> **The Agreement expired by its terms on June 5, 2011**.

### 3. Argument

The operative word in the decision of the arbitrator is the word **expired**. The arbitration served no purpose other than to resolve the dispute as to which contract was the controlling document.  Having reconciled this fact, the parties are now in the position to present facts to the court for its determination of the contractual disputes that exist. Interpretation of the contract would have been inappropriate for the arbitrator and is a duty best served by the court.

AAMCO has made representations to the court and focused the court's attention on Section 19.1 of the 1981 contract.  Section 19.1 is titled " Procedures After Termination."  In its complaint, AAMCO cites chosen provisions of Section 19.1.  It is important to note that there is no reference to provision 19.1(F) in the complaint. AAMCO seeks to pick and choose provisions of the contract it deems most favorable. These provisions are taken out of context.  AAMCO asks the court to implement only

the parts of the contract that they specify.  The intent of this action is to disadvantage Dunlap.

The decision of the arbitrator does not support AAMCO's position that they were victorious on the merits of the case. The decision of the arbitrator recognizes that AAMCO is not obligated under provision 19.1 F.   It provides no explanation for that decision.  However, this decision supports the position that there was no termination of the franchise agreement.  If a termination under the provisions of Section 19.1 had existed, Dunlap would have been obligated by the simple reading of the contract to "sell all inventories on hand to AAMCO at current market value".

AAMCO has intentionally avoided reference to Section 18.1 of the franchise agreement.  This section defines termination.  Section 18.1 provides AAMCO with certain rights to terminate the franchise agreement.  Section 18.1 requires AAMCO to advise a franchisee by written notice of any violation of the contract.  This section delineates the provisions of the contract and the violations that would trigger termination.  Section 18.1 includes a provision to cure.  AAMCO is aware that if there are violations of the contract, written notice must be given.  The franchisee has 30 days to correct procedures under the 1981 contract.

Section 16.1 of the AAMCO agreement is referred to as "Duration of the Franchise."  It states:

"This franchise agreement shall begin as of the date set forth above and shall continue for a term of fifteen (15) years. Unless either party gives written notice of its intention not to renew the agreement at least one year to the **expiration** of the fifteen (15) year term, then this franchise shall be renewed for fifteen (15) years.  Failure to renew by

9

AAMCO will be based on good cause; the parties agree that 'good cause' shall be defined to include the following:

> (a) any default set forth in Section 18.1 of the agreement not withstanding compliance with paragraph 18.1(b) or
> (b) any cause that in AAMCO's reasonable estimation brings discredit upon its trademarks and trade name or seriously interferes with AAMCO's legitimate business interests.
> (c) In connections with any renewal of the agreement, the franchisee agrees to execute a franchise agreement of the type then currently being used by AAMCO.  AAMCO expressly reserves the right to increase the franchise fee upon renewal in accordance with it's then current policy."

Section 16.1 requires that notice must be given one year prior to the expiration of the fifteen (15) year term if the party does not intend to renew.   Section 16.1 requires the franchisee to sign a renewal agreement of the type currently in effect.

Based on AAMCO's preferred choice of contract, Dunlap fulfilled the fifteen (15) year term of two (2) contracts.  AAMCO is fully aware of its decision of nonrenewal.

The current case was initiated in August 2011.   In October 2011, the American Bar Association Forum on Franchising published the Franchise Law Compliance Manual. Section 5.4 of that publication is titled, "Nonrenewal'.   This most excellent document notes differences between nonrenewal and termination.  It states:

> **"Nonrenewal differs from termination. If a franchisee relationship is not renewed, the relationship ends at the expiration of the terms specified in the agreement.  Termination on the other hand involves ending the relationship prior to the end of the bargain-for term and thus, evokes a forfeiture of the franchise contractual rights. "**

This position makes it evident that enforcement of termination procedures are not applicable when the franchisee has survived the stated duration of the contract and the

relationship has not been renewed by the franchisor.  What makes this passage more significant is that this particular chapter was authored by opposing counsel, James M. Goniea.  At the time of publication, Mr.Goniea was the General Counsel and Vice President of one of AAMCO's parent corporations, American Driveline Systems, Inc. Former Cottman counsel, William Jameson, filed the current complaint.  It was filed when Mr. Jameson was a subordinate of Mr.Goniea.  It is highly probable that the chapter, containing above quote, had been composed and submitted for publication at the time this contract was questioned in August 2011.

Prior to the conclusion of arbitration proceedings, a very similar franchise related litigation  was brought before the Fourth Circuit Court of Appeals.  That case involved a dispute between a franchisee, Devin Hamden, and a franchisor, Total Car Franchising Corporation.  In its conclusion, the Fourth Circuit Court of Appeals states:

> **"Having concluded that "termination" does not encompass  expiration under this set of agreements, we find unenforceable the nondisclosure and nonsolicitation provisions to the extent they rely on the franchise agreements termination.** *: see Hamden v. TOTAL CAR FRANCHISING CORPORATION*, No. 12-2085 (4th Cir. Nov. 22, 2013)."

The interpretation of the contract by the arbitrator is consistent with the Hamden decision.  The Fourth Circuit relied on the decision of the Virginia Supreme Court in Clinch Valley Physicians v. Garcia  *see Clinch Valley Physicians, Inc. v. Garcia*, 414 S.E.2d 599, 243 Va. 286 (1992).

 In that case the Virginia Supreme Court held that:

> "'any reasons' must be construed with respect to any of the reasons for which the party invoking termination might end the employment contract and not as inclusive of mere nonrenewal. "

The Clinch Valley decision concluded by stating:

11

> "Considering Article 16 in context with Articles 1, 3, and 4, we conclude that it can be read reasonably to apply only to those instances in which CVP has terminated an employee for cause. Even if this may not have been what CVP intended when it drafted this provision, we are limited to the language of the contract, strictly construed. *Linville,* 211 Va. at 55, 174 S.E.2d at 786-87. If CVP**, the scrivener of the contract, had intended to make the restrictive covenant applicable upon nonrenewal, it should have said so in explicit terms.**"

The Fourth Circuit went on to note:

> "**that termination occurs upon an action**: either Hamden's violation of the franchise agreement or his notice of intent to terminate. Applying Clinch Valley's principles, the franchise agreement's failure to indicate that termination arises passively through expiration, which it recognizes as a separate event in Section 2, indicates that expiration does not trigger the restrictive covenants."

**4. This court's grant of a preliminary injunction**

On August 18, 2011, this court granted AAMCO Transmissions' request for a preliminary injunction. This grant was based on AAMCO's misrepresentations of its rights under the franchise agreement, its embellishment of its trade secrets and misstatement of its relationship with Dunlap.

**5. The Preliminary Injunction should be dissolved, the Stay of Proceedings Removed, and Dunlap should be afforded the opportunity to answer the claims and file counterclaims.**

### A. The Plaintiffs' claim does not succeed on the Merits

This preliminary injunction should be dissolved. AAMCO has failed to establish that it has achieved success on the merits of the claims. The decision of the arbitrator only chose the agreement. The provisions of the chosen agreement do not support injunctive

action. Absent a violation of Section 18.1 of the contract and supporting written notice, the provisions of Section 19.1 are not triggered.

### B. The Plaintiff's have failed to establish Irreparable Harm

The plaintiffs have asked the court to allow a presumption of Irreparable Harm.

The Third Circuit of Appeals has raised the standard for the presumption of harm in the award of an injunction. See *FERRING PHARMACEUTICALS, INC. v. Watson Pharmaceuticals, Inc.*, No. 13-2290 (3d Cir. Aug. 26, 2014). The mere conclusions set forth by the plaintiffs do not rise to the level necessary to support the injunctive action.

### C. The Settlement Agreement is incomplete

In the current and prior litigation, the plaintiffs have introduced the 2007 Settlement Agreement. In none of the litigation has the agreements cited as Exhibit A been included. There was no Exhibit A attached to the original.

### D. Violation of the Pennsylvania Uniform Trade Secrets Act

In 1978 during litigation between William McAlpine and AAMCO see *McAlpine v. AAMCO Automatic Transmissions, Inc.*, 461 F. Supp. 1232 (E.D. Mich. 1978). District Judge Guy entered a decision that has been ignored by the AAMCO that exists today. In that litigation, AAMCO had characterized its telephone procedures and various documents as trade secrets. The court concluded that AAMCO's merchandising system and telephone procedures do not constitute an original complex unique system which would entitle AAMCO to trade secret protection. The court noted that AAMCO's alleged secret

procedures were little more than an efficient form of recording information. AAMCO is in the business of providing a product. If AAMCO is in the business of selling anything to a customer, it is a quality rebuilt transmission not a well-organized sales pitch. When AAMCO was in its infancy, AAMCO's director of franchise training, Mr. Larry Kliik, developed the telephone track portion of the merchandising system and its diagnostic procedures. Mr. Kliik"s deposition, which was admitted into evidence, is highly probative as to the lack of originality and uniqueness of AAMCO's telephone procedure. Id Mr. Kiick sold these procedures that he developed to AAMCO competitor Cottman Transmissions and to Milex, a tuneup company that is owned by the parent of Mr. transmissions.

In reviewing Dunlap's documents and comparing other litigation filed by AAMCO, one finds that AAMCO has churned out a large number of documents in which Mr. O'Donnell, Mr. Leff and Mr. Wright, a Cottman President, and others have put forth AAMCO's claim of trade secrets.

I am confident that AAMCO will decry the fact that McAlpine involves a decision that is almost 40 years old. However, as a longtime franchisee of AAMCO Transmissions, Dunlap can attest that the procedures have been virtually unchanged since 1978. This court accepted the representations of Mr. O'Donnell as true. The Trade Secrets claims were referenced in its decision and cited as support for the Injunction. The same types of procedures are well known throughout the industry and similar classes are taught at the Automotive Training Institute and the Success Management Institute.

In order for Mr. Dunlap to defend against AAMCO Transmissions' claims, AAMCO must delineate with great specificity the trade secrets that it claims Mr. Dunlap has for operation. The mere conclusion fails to meet the standards of Twombly.

In a scholarly paper written by James Rubinger, litigation that arises after the acquisition of a franchisor by a competing brand is described. At the end of the document, Mr. Rubinger admonishes those who might purchase a franchise organization to review the documents that exist between the franchisees and the franchisor to ensure that provisions within those documents allow for the sale and the transfer of the business. If those documents do not exist, Mr. Rubinger advises the parties to take steps to alleviate the legal problems or prepare to accept the potential liability. Mr. Rubinger is currently involved in the cases that Dunlap filed in Virginia. It is somewhat sad that AAMCO and American Capital did not consult Mr. Rubinger prior to the sale and purchase of AAMCO Transmissions.

### E. ABUSE OF PROCESS

Through their actions and misrepresentations to the court, the plaintiffs obtained an unwarranted Preliminary Injunction. The primary purpose of the injunction was to prevent Dunlap from continuing to work in the trade as he had for over thirty years and to direct the customers away from Dunlap's business. *Peek v. Whittaker*, No. 2: 13-cv-01188 (W.D. Pa. May 22, 2014).

### F. VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALINGS

The Pennsylvania courts in Cottman v. McEeny and Cottman v. Kershner

*Cottman Transmission Systems, LLC v. Kershner*, 536 F. Supp. 2d 543 (E.D. Pa. 2008). have recognized that Pennsylvania Supreme Court would probably enforce the covenant of good faith and fair dealings when the termination of the franchise was involved. In the current case, the court notes that both parties have been unable to produce a signed copy of the franchise agreement. During the arbitration, Dunlap did produce a copy stamped ""For Your Files Do Not Sign", but it was disregarded by the arbitrator. One of the provisions of the 1981 contract is that the franchisee must sign a current contract upon renewal. While this court has affirmed that the renewal was automatic, it did not address this part of the requirement. Prior to the expiration, it is quite obvious that AAMCO was aware that they had no new signed contract. This is a gross violation of the covenant of good faith and fair dealings because AAMCO laid back and waited to ambush Dunlap at the last minute. Under the section 18.1 of the agreement, AAMCO could and perhaps should have sent Dunlap a letter of intent to terminate based on the failure to sign the document from 1998. Dunlap then would've had 30 days in which to sign and return the document. AAMCO was remiss in his duties and its obligations to Dunlap.

## CONCLUSION

Based on the above information, the request to grant a permanent injunction should be denied. The request to exonerate the Injunction bond should be denied. AAMCO has made intentional omissions in its presentation to the court by its selective representation of the provisions of the contract. It has gained an unjustified advantage through its claim of Trade Secret protection. The court should remove the stay of proceedings and afford

Dunlap the opportunity to respond to the complaint.  The Injunction Bond should not be removed.

_____

James M. Dunlap
Pro Se
1312 Debree Ave
Norfolk, VA   23517
757-287-6815
miltondunlap@netzero.com